In the matter of the last will and testament of JAMES M. DIETZ, deceased, late of the county of Essex.

1. A will drawn by the testator stated that it was signed by him and attested by the witnesses, in the city of New York, on June 18th, 1880. A doctress testified, on a *caveat* thereto, that she attended the testator every day but three (the 8th, 9th and 12th) in June, 1880, at his home, in Orange, New Jersey; that on June 18th she called on him there professionally, and that he was then confined to his bed by rheumatism, and she also testified that she thought he was physically unable to go to New York on any day in June. She was partly corroborated by testator's widow, and also by a female servant and a hired man. These witnesses testified to events four years after they occurred, and almost entirely from recollection. On the other hand, were the intrinsic evidence of the will and the direct testimony of the disinterested attesting witnesses, while there was, besides, plenary proof, both written and oral, that the testator was in New York on the 16th and 19th of June, and

also on other days during that month.—*Held*, that the will should be established as having been executed in New York, on June 18th, 1880.

2. That a testator changes some of his bequests in a subsequent will is no ground for questioning his capacity or its validity, or for refusing it probate, since he is not obliged to disclose his motives, or to explain the reasons for the changes, or even to mention them in his will.

3. The orphans court, after admitting a will to probate, ordered that assets of the estate in the possession of persons in New York, who were before the court, one as proponent of another will of the testator, and the other as witness thereto, be handed over by them to the administrator with the will annexed.—*Held*, that the court had jurisdiction to make the order.

On appeals from decrees of the orphans court of the county of Essex.

*Mr. John Linn, Messrs. Parmly, Olendorf & Fisk, Mr. E. T. Bartlett* (of New York), and *Mr. B. Williamson*, for appellants.

*Mr. C. Parker*, for respondent.

THE ORDINARY.

James M. Dietz, late of East Orange, in the county of Essex, died at that place on the 31st day of March, 1884. Two instruments of writing, purporting to be wills of his, one dated January 6th, 1870, and the other June 18th, 1880, were propounded for probate before the orphans court of Essex county. His widow (he had no children) and his brother, Samuel Dietz, each filed a *caveat* against admitting to probate any paper purporting to be his last will and testament, until after examination and decree thereon by the orphans court. After a long and severe contest, the will of 1870 was, by the decree of the orphans court, admitted to probate, and the will of 1880 rejected. From that decree, appeals were taken. The appellants are Samuel Dietz and William Cheney, executors of the will of 1880, Samuel Dietz, the American Baptist Home Mission Society, the American Baptist Missionary Union and the American Female Guardian Society, otherwise known as the Home for the Friendless, legatees under that will.

The will of 1870 was executed in the city of New York, while the testator resided there. It was drawn by Mr. Fransioli, a lawyer of that city, and witnessed by him and Joseph F. Mosher, who at that time was a clerk in his office. By it, the testator gave to his wife his household goods, furniture and paintings, and the income of his estate, for life, and he gave, upon her death, $3,000 to his adopted daughter, Maggie Dietz, and the interest of $15,000 to his sister Sophia, for life, the principal, at her death, to go to Christopher Wolston, then of the city of New York, to whom he gave, also, the residue of his estate. He appointed John L. Campbell, physician, of Brooklyn, and William Cheney, then the testator's bookkeeper, executors.

The will of 1880 is a holograph. By it, the testator gave to his wife all his household furniture, cooking utensils, beds and bedding, books and pictures, his horse and buggy and carriage, and all the articles appertaining thereto. All the rest of his estate he gave to his executors, in trust, first, to pay his brother, Samuel Dietz, $1,000 a year for life; second, to apply the balance of the interest, income, rents, issues and profits to the use of his wife, annually, for life; third, to pay to his aunt, Mary E. Dietz, if living, $500; fourth, to pay to the American Baptist Home Missionary Society, $10,000; fifth, to pay to the American Baptist Missionary Union, $5,000; and sixth, to pay over, deliver and convey all the residue of his estate to the Home of the Friendless, in East Twenty-ninth street, in the city of New York. He then added:

"In case I have not precisely and correctly described the proper, corporate, or associated names and titles of the American Baptist Home Mission Society, the American Baptist Missionary Union, and the Home of the Friendless, in East Twenty-ninth street, yet my executors will not doubt what institutions, associations or establishments are intended by me in using those designations; and if, by reason of any misdescription herein of them or of either of them, or if, by reason of their, or either of their, not being incorporated, they would not respectively take the gifts and devises hereinbefore given and declared in respect to them or either of them, then and in such case as to them respectively, I give to my said executors the power of appointment of the portions of my estate so by me declared to be given and devised respectively to said American Baptist Home Mission Society, the American Baptist Missionary Union, and the Home of the Friendless in East Twenty-ninth street, city of

New York, so that my said executors shall apply and appropriate the same to the use of the said associations that I have so described as the American Baptist Home Mission Society, the American Baptist Missionary Union, and the Home of the Friendless in East Twenty-ninth street, in such manner as to my said executors may seem best and most likely to effect my wishes as above expressed in the premises."

He then appointed his brother, Samuel Dietz, of Grove street, East Orange, in this state, and William Cheney, of Brooklyn, Long Island, executors, and declared that all the powers, authority and discretion therein given to them, were given to them and the survivor of them, and to whichever of them, if but one, should take upon himself the execution of the will, without bonds; and he empowered his executors to sell his real estate and invest the proceeds thereof, and his personal estate, in such securities, real and personal, public or private, as they should from time to time see fit.

The will is, as before stated, dated June 18th, 1880. It was drawn by the testator, in his office in the city of New York, on that day, in the presence of Frederick B. Smith and Gustave Horst, the two members of the firm of F. B. Smith & Horst, die sinkers and engravers, who also carried on their business there. Mr. Smith testifies, and he is corroborated by his partner, that the testator came into the office in the forenoon and got some paper and wrote; that the witness did not know what it was that he was writing until the testator told them what he had written; that the testator was engaged in writing about an hour and a half or two hours; that when he had written the will, the testator called on the witness and Mr. Horst to come and witness his last will and testament; that he called them "Smith" and "Gus" (meaning Horst, whose Christian name is Gustave), and said to them that it was his last will and testament, and that he wished them to witness his signature; that the testator signed his name to the will, and then read the attestation certificate, and then the witness said to the testator: "You acknowledge this to be your last will and testament, in regard to your personal effects and all your property," or something to that effect, or, as the witness afterwards says: "You

acknowledge that to be your last will and testament, and acknowledge that to be your signature." That the testator said he did, and that the witness then said: "Does this contain the disposition you wish to have made of your property, real and personal?" and the testator replied that it did. He further says that after the testator had signed his name and read the attestation certificate the witnesses signed their names. After the will had been signed, the testator folded it up, and went out of the room into the next room, taking the paper with him. Mr. Smith had been acquainted with the testator for over thirty years, and had witnessed a will for him about twenty years previously. He says the testator was as sound in mind as he had ever known him in thirty-two years; that he was perfectly sound. Mr. Horst had known him for about six years. He says he was of sound mind. There is no evidence entitled to any weight that at that time the testator was not possessed of full testamentary capacity. Dr. A. L. Fowler Ormsbee, a doctress, of Orange, testifies that she attended him in an illness of a severe character, which, she says, confined him to his bed during the whole of the month of June, 1880. She says that she thinks he was in an unsettled state of mind; that his "physical condition was very exaggerated, and that he was suffering a great deal," and that she should suppose a man in his physical condition would not be in a very good mental condition. She says, also, that she thinks his intellect was very much impaired by his previous life (referring to habits of intemperance), and that his mind was more or less distorted; but she says also that he understood what she said to him, and, as a rule, gave rational answers. He subsequently (July 31st, 1880) paid her $194 for medical services. In settling the bill he objected, she says, to one of her charges. He gave her his check for the $194, payable to her order, and she endorsed it, and obtained the money for it. An examination of the checks which he gave about the time in question, and of the memoranda in his check-book, and the other evidence of his business transactions, renders it entirely clear that on the 18th of June, 1880, he was not only possessed of testamentary capacity, but of excellent business ability. Mrs. Dietz, the widow,

when asked, in her direct examination, what was the condition of his mind with respect to testamentary capacity, from the beginning of 1880, answered that for the last three years of his life (he died in March, 1884) she "should not think" that he was competent to make a will.   On her cross-examination she says that he was incompetent, because he "indulged so strongly in liquor that he was scarcely ever himself." She says he conducted his own business altogether in 1880, and he appears to have attended to his business down to December 12th, 1883, a few months before he died.   Mrs. Dietz, when asked when it was that Samuel Dietz acted for her husband, answered that she never knew that he acted for him.   The will in question is itself evidence of the complete possession by the testator of testamentary capacity.   He wrote it himself.   Including the attestation certificate, it covers five pages of legal cap paper, and it is written in a current hand, without a single erasure.   The words "without bonds" are written in a larger hand than the rest of the instrument, and they are emphasized by underscoring.   It is urged that the instrument contains internal evidence that it was drawn by a lawyer.   There is no evidence on that head, except such as the will itself affords.   There is no evidence that he copied the will from any other paper, or that he had any other paper at the time he wrote it, nor is there any evidence to the contrary.   But, if he did copy it, that would be evidence of competency, rather than incapacity.   It would be evidence of care and painstaking in the preparation of the will, in order that his wishes in the disposition of his property thereby might not be defeated if he could prevent it.   That he knew what he was about in making the will is beyond all question if the testimony of Smith and Horst is to be believed, and no attempt was made to impeach their character for veracity.   Experts were called, in opposition to the will, to speak as to the handwriting.   It is quite unnecessary to consider their testimony.   It is not of such a character as to demand attention.   The proof, from comparison, is so clearly in favor of the genuineness of the instrument, and shows so conclusively that it was written and signed by the testator, that it would be waste of time to dwell upon that subject.

19

And here the fact that the testator, in the last clause of the will, misspelled the words " eighteenth " and " eighteen," spelling the one " eithcenth," and the other " eitheen," may be adverted to.    The orphans court regarded these errors as evidence that the testator did not write the will.    But it will be found, on examining the letters of the testator that have been put in evidence, that he frequently misspelled words, sometimes omitting a letter.    And again it will be seen that, in the date of the will in which the words " eighteenth " and " eighteen " are misspelled, he spells the word " eighty " correctly.

What has been said in reference to the testimony of the experts produced by the caveators on the subject of the will and the signature of the testator, is equally applicable to their testimony as to the signatures of Smith and Horst upon the will. Smith and Horst signed twice ;· once under the *in testimonium* clause, and again under the attestation certificate.    The signatures were written on the same occasion.    It seems, from the testimony, that when the testator signed the will the witnesses signed under the *in testimonium* clause as witnesses to that fact, and signed the attestation certificate after he had read it to them.    There is no reason to doubt the genuineness of their signatures, nor that they were all written at the time of the execution of the will.

But an effort was made (and it was successful in the orphans court) to discredit Smith and Horst by evidence that, at the date of the will, the testator was sick abed at home, in Orange, and was not in the city of New York on that day.    Indeed, the testimony goes further, and, if entitled to confidence, would establish the fact that the testator was not only unable to rise from his bed on that day, but had been in the same condition for the whole of the preceding part of the month, and remained so (or, at least, was unable to leave his house) up to the 1st of July. The principal testimony on this point is that of Dr. Ormsbee. She says that on the 1st of June they sent for her in the night, and she was there all night ; that the testator had cystic hemorrhage, and it reduced him very much ; that previously to this he had inflammation of the lungs, or pneumonia, which had reduced him very much ; that her visits to him were constant, with

the exception of three days, the 8th, 9th and 12th, in the month; that he was affected with muscular rheumatism, which rendered him helpless; that he was obliged to remain on the bed, except when persons moved him—except when he was helped by some one else; that he was lifted from the bed to the lounge by persons who had the strength to do it, and that he was not able to get off the bed himself. To the question whether he was able to write, she answers that she cannot say whether he was or not; that she knows that he should not have written; that he was not able to write, and he could not have written any more than his name; that the rheumatism confined him entirely to the bed; that he was so that he could not have been, on the 18th, in New York; that she visited him on that day, and that it would have been impossible for him to go to New York unless by some miraculous transfer. She adds that he was not in New York on any day in June. The witness speaks from recollection and from her account book in which she made her charges for visits to her patients. There are other witnesses who testify that the testator was sick abed on the 18th of June. They are the widow, and Elizabeth Somerville and Joseph A. Marsh. The widow testifies that the testator remained ill and in bed five or six weeks, and that it was four or five weeks after the 18th of June that he became convalescent. Elizabeth Somerville says she went to the testator's house on the 16th, which she thinks was Tuesday, and she stayed there until Friday of the next week. She says he was confined to his bed all the time she was there, and that he got up only on one day, Thursday, of the week in which she left, and then he walked across the room only until they got the bed changed. She says, also, that before that he had not been up and had not been able to be up at all. Joseph A. Marsh testifies that he was employed by the testator to attend to his horse &c., and do work generally around the premises; that in June, 1880, the testator was "sick and complaining; mostly confined to his room," and that he was in bed most of that time; that the witness assisted him in getting up from the bed during his sickness; that he is positive the testator did not go to New York for two weeks at least before the 24th of June, at which time the witness left his

employ, but returned to it again about three weeks afterwards, and stayed about two months or two months and a-half longer. According to the testimony of this witness (and he is corroborated by other witnesses), on the 24th of June the testator was not only not confined to his bed, but was about the house, and was so violent toward his wife that she sent the witness to appeal to a neighbor for her protection. The witness did the errand, and when he returned the testator threatened to kill him with a carving knife, which he had in his hand, for going, and it was with some difficulty that he was restrained from doing the witness bodily injury with the knife, until the witness escaped from the house. It is very evident, from this transaction, that the testator was not confined to his bed during the whole of the month of June, and that on the 24th he was capable of very considerable bodily exertion. But there is proof that on the 16th day of June, two days before the will was drawn, he was in his office in New York, and there drew a check for $61.48 to the order of Charles Doughty, a real estate or insurance agent at East New York, for payment of a bill due from the testator for some expenses for repairs &c. upon a small house he owned at Belle Plain, in the town of New Lots, and gave it to Mr. Smith, requesting him to deliver it to Doughty, which Smith undertook to do. Smith went with it to Doughty's office, but did not find him in, and therefore brought the check back with him, the next day. When at Doughty's office he wrote a note to Doughty informing him of his visit and errand, and requesting him to inform him by postal card how he could safely get the check sent to him. He says in the letter that the testator had been sick and could not attend to the matter personally, but that he was then better, and that the testator might not be in New York until Friday of that week. The note is produced. It is dated June 16th, 1880. The postal card written by Doughty in reply is also produced. It is dated June 17th, 1880. Mr. Smith says that when the testator gave him the check on the 16th, he told the witness that he would not be in the office the next day (the 17th), as he expected Mr. Fransioli's son to come out to his place for some cherries, and he was going

to give him a drive, but he would be in his office again on Friday. As already stated, he swears that the testator came in on Friday, and drew and executed the will. Mr. Fransioli's wife and the son referred to testify that the latter came out on the 17th of June and made the visit and got the cherries, and the son says that he took the drive with the testator. Doughty's bill for the $61.48 is also produced—receipted, and it is endorsed by the testator, "Charles Doughty, $61.48, paid June 18th, 1880." The testator appears to have drawn his check on the 19th for $50, and got the money for it himself, in New York, from one J. Trigan, who kept the restaurant to which he was in the habit of going for his meals. On the 28th he drew two checks—one for $38.37, to the order of Edwin W. Hine, to whom it was delivered, and who endorsed it and got the money for it, and the other for $50, to his own order. He appears to have endorsed the latter check to Thomas F. Brosnan, who endorsed it and got the money for it. He drew a check on the 1st of June, 1880, for $50, to his own order, and endorsed it to Purss & Young, who endorsed it and obtained the money for it. Between the 1st and the 16th he drew no checks. Bills rendered to him are in evidence, which are endorsed by him as having been paid—one on the 10th of June, one on the 16th, two on the 17th, one besides that of Doughty on the 18th, and two on the 28th. It seems quite probable that the testator was sick for a few days in the early part of June. Mr. Fransioli, it should be observed, swears that he saw the testator in New York and did business with him there on the 12th and 14th of June. The testator was in New York on the 16th, and drew the check for Doughty. He kept his check-book in the office there. The stub of the check in the book contains the following entry in the testator's handwriting :

"June 16th.
"To pay for repairs of house at Bellplain, Long Island, to the order of Charles Doughty, $61.48."

The will is evidence that on the 18th he was in New York. It is dated on that day. Not only so, but, in addition to its date, the date is twice stated in the attestation certificate. Smith and

Horst are wholly disinterested witnesses, and they swear he was there on that day, and they are not in any way impeached. There is a fact sworn to by Mr. Fransioli of some importance in corroborating them. He says that in the spring of 1880 the testator said to him that he wanted him to draw another will for him; that he, Fransioli, replied that the testator could come to his office at any time he desired, and he would be glad to attend to him. He says the testator did not come, and that afterwards they met and he said to the testator that he, the testator, had not come, and the testator said : "Well, I have attended to that business myself without any lawyer; I have cheated the lawyers." The will was found in a safe in which the testator kept his valuable papers, where he himself had put it, in a sealed envelope endorsed by him, addressed originally "William Cheney, Bank of America," (where Cheney was employed) to which he appears to have added, after Mr. Cheney's name, " or my bro. Samuel." Mrs. Dietz testifies that the testator told her that she would find all the papers "in the safe in Mr. Smith's office." Mr. Cheney, who is wholly disinterested, swears that the will and signature are in the handwriting of the testator. He was his bookkeeper from March, 1869 to March, 1872, three years, and is well acquainted with his handwriting. Mr. Fransioli and Samuel Dietz, and the expert, Mr. Carvalho, all testify to the same thing. And here it may be remarked that the witnesses who swear that the testator was not in New York on the 18th of June swear from memory as to what his physical condition was, and as to what he was or was not able to do on a particular day four years before they gave their testimony.

It is urged that the will is the result of undue influence on the part of Samuel Dietz, who, it is alleged, was actuated by desire of gain and by dislike of the testator's wife. But there is no proof of such influence, nor is there any of such dislike at the time when the will was made. Mrs. Dietz testified that there was no unfriendliness on his part towards her until the last year of the testator's life. She says that he had always come over every Saturday to sit at the table and have dinner with them, and was pleasant and polite to her until the last year of

the testator's life, and the other evidence shows that whatever discord there was between them occurred within the period she mentions.   Samuel Dietz swears that he had no part or instrumentality in preparing the will or in having it prepared; that he did not know his brother had written it; that the testator never consulted him in regard to preparing a will for him, and that he never spoke nor made a suggestion to the testator about writing his will.   He says that in November, 1883, the testator said to him that in case anything should happen to him, the testator, he, Samuel, would find the document or documents which he would need under Samuel's private checks, in the right-hand corner of the safe, and he swears that that was all the knowledge he had of the paper.

The will, so far as the widow is concerned, differs from the will of 1870 only in that it gives to Samuel $1,000 of the income and the rest of it to her, while, by the will of 1870, the whole of the income was given to her.   There is a similarity between the two wills in this: that in both the testator preserves the *corpus* of the estate intact until his wife's death.   By the first, he gave, after her death, $3,000 to his adopted daughter, and the interest of $15,000 to his sister Sophia, and then gave the residue, including the $15,000 after Sophia's death, to Christopher Wolston, a friend of his.   It appears, by the testimony of the adopted daughter, that she married (it would seem without his consent), and left the family in 1875. The testator's sister Sophia is dead.   She died in 1877.   Maria E. Dietz, the testator's aunt, to whom $500 are given by the will of 1880, was an indigent invalid.   She became dependent upon charity for support after the will of 1870 was made. What the testator's reasons were for the change of testamentary disposition, so far as his wife was concerned, do not appear. Nor does it appear that she, in fact, will get less by the will of 1880 than she would have got under that of 1870 had he died then, for it does not appear that his estate was not much larger in 1880 than it was ten years before.   The estate appears to be worth $60,000.   It was alleged on the hearing (but I find no proof of it) that the Orange property, which was bought after

the making of the will of 1870, was given by the testator to his wife. It appears that he gave to her, after the making of the will of 1870, real estate in New York which she sold about 1880 for $11,500. But it by no means follows that if the court cannot find a reason satisfactory to its own mind for a change of testamentary disposition, the last will must therefore be rejected. *Stat pro ratione voluntas.*

I will not discuss at length the matters which are presented on behalf of the widow as evidence of fraud on the part of Samuel Dietz and Mr. Fransioli. I find nothing in them to lead to any conclusion adverse to the genuineness of the will under consideration, nor to induce the conviction that the instrument was the result of any imposition or fraud.

It is urged on the part of the widow that what was said in *Delafield* v. *Parish, 25 N. Y. 9, 35,* is apposite to this case, viz. : " That it is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved and great difficulties oppose themselves to so doing, and that when it is sought to establish a posterior will to overthrow a prior one made by the testator in health, and under circumstances of deliberation and care, and which is free from all suspicion, and when the subsequent will was made when the testator was in enfeebled health, and in hostility to the provisions of the first one, the prior will is to prevail, unless he who sets up the subsequent one can satisfy the conscience of the court of probate that he has established a will. Also, that the prior will is to prevail unless the subsequent one is so proven to speak the testator's intentions as to leave no doubt that it does so speak them." In adjudicating upon the admission of wills to probate, it is the manifest duty of the court to uphold the right of free testamentary disposition of property, and not to attempt to annul or control it by considerations wholly at variance with that right. It is its duty to sustain the instrument, and admit it to probate if it finds that it is the duly executed last will and testament of the testator. If he is proved to have been possessed of testamentary capacity at the time of making the will, and the will does not appear to have been the result of any fraud, and it

Dietz's Case.

is proved to have been duly executed, the court has no right to reject it. If probate courts are to determine from any other considerations whether a will ought or ought not to stand, then there will be an end of that right of free testamentary disposition of property which it has been, and is the policy of our law to favor and guarantee. In the case in hand I am satisfied that the testator executed the will in the city of New York, on the day of its date, with all the legal formalities required by the law of this state; that at the time he was possessed of full testamentary capacity, and there is no proof that the will was the result of any manner of fraud.

It is urged that the fact that the testator has given considerable legacies to two religious societies, and has given the residue of his property to an eleemosynary society, is a suspicious circumstance. But the first two are societies of a religious denomination with which he was long connected, and the other is a most worthy public charity.

The fact that he has made those societies his legatees is surely not more remarkable than the provision which, by the will of 1870, he made for Mr. Wolston, who was not a relative of his, but only a friend. He had a right to give the property to the societies, or to his friend, just as he saw fit. The reasons which induce a testator to change his testamentary disposition of his property, or to make a disposition of his estate which appears to be unequal or even absolutely unjust, may be very good ones, and yet they may be wholly confined to his own breast. He is not bound to mention them in his will, under penalty of having it rejected by the probate court if he fails to do so.

The decree of the orphans court admitted to probate the will of 1870 and rejected that of 1880. It directed that Samuel Dietz pay the costs of the caveatrix and $2,000 counsel fee to her counsel. It also directed that letters of administration with the will annexed be issued to George H. Hartford, the executors named in the will of 1870 having made no application for probate thereof, although notified and requested to do so. The decree will be reversed, and there will be a decree refusing to admit the will of 1870 to probate and admitting the will of

1880. The costs of both sides in the matter of probate, both in this court and in the court below, will be allowed out of the estate, with a counsel fee of $1,500 for each side in both courts.

The orphans court appointed an administrator *pendente lite* in the cause, and on the day on which the decree above mentioned was made, and after the making thereof, it made an order by which, after reciting that it had appeared to the court, by the examination of Samuel Dietz and Augustus G. Fransioli, that they had severally received, since the death of the testator, moneys belonging to his estate, or due to him, it was ordered that they forthwith pay to the administrator with the will annexed, or to the administrator *pendente lite*, in case of appeal from the before-mentioned decree of the court, denying probate to the will of 1880 and admitting the will of 1870 to probate, all moneys by them, or either of them, received since the death of the testator, due to the testator or coming to his estate, with interest thereon from the time of such receipt, and also deliver to such administrator all books, papers, securities, certificates of stock, bonds, mortgages, or other choses in action belonging to the testator which, at the time of making the order, were in the possession of either of them, and that Samuel Dietz give to the administrator, on demand, access to the safe of the testator proved in the cause to have been and to be in the office of Samuel Dietz, in the city of New York, to the end that any papers and securities of the testator there being might be found and taken into the administrator's possession. From that order Samuel Dietz and Mr. Fransioli appealed. It is argued that the court had no jurisdiction to make the order. It had jurisdiction of the subject matter and of the parties. Speaking generally, the order was a direction (it was an authorization also) to pay and deliver over property of the estate to the person entitled by law to the custody of it. There was no conflict of jurisdictions. The order directed the parties to do nothing which it was not their plain duty to do without it. It does not appear that they were in any way prejudiced or aggrieved by it. It will be affirmed, with costs.