**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4560-18T3

IN THE MATTER OF THE
ESTATE OF VIRGINIA J.
OGBORNE,

     Deceased.

_____

Submitted March 16, 2020 – Decided May 18, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. P-264586-19.

Ferrara Law Group, PC, attorneys for appellant James Yuhasz (Ralph P. Ferrara and Kevin J. Kotch, of counsel and on the brief).

Joseph R. Bulman, attorney for respondent David Yuhasaz.

PER CURIAM

Virginia J. Ogborne died testate in March 2019. Her last will and testament, executed on January 11, 2016, left the remainder of her estate in equal shares to her sons, David and Michael, after nominal specific bequests, including

one in the amount of $1000 to her son, James.[1]  After James filed a caveat to the will, David—who was named executor—filed a complaint and order to show cause (OSC) in a summary action to strike the caveat and admit the will to probate.  James appeals from the trial court's order, entered on the return date of the OSC, granting the relief David sought without a plenary hearing.

On appeal, James reprises his arguments to the trial court that the will was procured by undue influence, Virginia lacked testamentary capacity to execute the will, and David's counsel, who was the same attorney who prepared the 2016 will, should have been disqualified from the matter.  Reviewing the record, we determine James failed to present any facts that raised a genuine issue to preclude entry of the trial court's order and affirm.

David commenced this action in accordance with Rule 4:83-1 which provides, in part:  "Unless otherwise specified, all actions in the Superior Court, Chancery Division, Probate Part, shall be brought in a summary manner by the filing of a complaint and issuance of an [OSC] pursuant to R. 4:67."  See also N.J.S.A. 3B:2-4.  Under Rule 4:67-5, the trial court must try the case on the return date of the OSC or a "short day" it fixes.  The trial court is compelled to

---

[1]  Inasmuch as all parties bear the same surname, we use their given names for clarity, meaning no familiarity or disrespect.

A-4560-18T3

hold a hearing if "there may be a genuine issue as to a material fact," at which the court "shall hear the evidence as to those matters which may be genuinely in issue, and render final judgment." Ibid. But, if "the affidavits show palpably that there is no genuine issue as to any material fact, the court may try the action on the pleadings and affidavits, and render final judgment thereon." Ibid.

The trial court's review of James's certification submitted in support of his answer to David's OSC led to its conclusion that "there wasn't any real meat to it, . . . [t]here was a lot of supposition[.]" It went on to conclude there was "no reason not to admit this [w]ill to probate," finding the contested will "very well laid out," provided a $1000 bequest for James as well as an ad terrorem clause, fully complied with Title 3B, was "properly executed . . . [and] properly witnessed[.]"

Our review of summary actions conducted pursuant to Rule 4:67 applies the usual standard for civil cases. See, e.g., O'Connell v. N.J. Mfrs. Ins. Co., 306 N.J. Super. 166, 172-73 (App. Div. 1997) (applying substantial-credible-evidence standard in reviewing a decision from a summary action), appeal dismissed, 157 N.J. 537 (1998). "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484

(1974). When a court makes findings of fact based on documentary evidence alone, however, no special deference is warranted. See Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988); Jock v. Zoning Bd. of Adjustment of Wall, 371 N.J. Super. 547, 554 (App. Div. 2004), rev'd on other grounds, 184 N.J. 562 (2005). And, "[o]ur review of a trial judge's legal conclusions is de novo." Walid v. Yolanda for Irene Couture, Inc., 425 N.J. Super. 171, 179-80 (App. Div. 2012).

James contends he presented sufficient evidence that Virginia's will was the product of undue influence to warrant discovery and a plenary hearing. Our courts have long recognized that undue influence is "mental, moral, or physical" exertion sufficient to preclude the testator's exercise of free will, by preventing them "from following the dictates of [their] own mind," and succumbing to "the domination and influence of another," in dividing their estate. In re Estate of Neuman, 133 N.J. Eq. 532, 534 (E. & A. 1943); see also Haynes v. First Nat'l State Bank of N.J., 87 N.J. 163, 176 (1981).

The shifting burdens of proving undue influence were explained by our Supreme Court:

> Ordinarily, the burden of proving undue influence falls on the will contestant. Nevertheless, we have long held that if the will benefits one who stood in a confidential relationship to the testator and if there are

4

additional "suspicious" circumstances, the burden shifts to the party who stood in that relationship to the testator. In re Rittenhouse's Will, 19 N.J. 376, 378-79 (1955). In general, there is a confidential relationship if the testator, "by reason of … weakness or dependence," reposes trust in the particular beneficiary, or if the parties occupied a "relation[ship] in which reliance [was] naturally inspired or in fact exist[ed]." In re [Estate of] Hopper, 9 N.J. 280, 282 (1952). Suspicious circumstances, for purposes of this burden shifting, need only be slight.

When there is a confidential relationship coupled with suspicious circumstances, undue influence is presumed and the burden of proof shifts to the will proponent to overcome the presumption.

[In re Estate of Stockdale, 196 N.J. 275, 303 (2008) (alterations in original) (citations omitted).]

Through that lens, James's submissions to the trial court were insufficient to establish his claim of David's undue influence over Virginia at the time the will was executed. See In re Livingston's Will, 5 N.J. 65, 76 (1950) ("Undue influence, to vitiate a will, must be operative at the time the will is executed."). In his certification, James advanced that after Virginia's hospitalization in 2014, David changed the locks on Virginia's residence. When James returned telephone calls Virginia made to him after he moved to Florida in early 2016, "she did not answer." "At some point, . . . David and his girlfriend moved into [Virginia's] home, assum[ed,] care for her[,] but instead they isolated and

controlled her. [James] was not allowed to visit her, and [his] cousin Sandy [Kohler] was also not allowed to visit or call her[.]" James averred he did not learn of the new will—which replaced one in which he received a share equal to his brothers and named Sandy as executor—until after Virginia's death. He claimed:

> I believe my brothers have exercised undue influence over [Virginia] or some other misconduct occurred which resulted in the 2016 purported will. I do not believe that [Virginia] intended to limit my share of her estate to [$1000]. [Virginia] had a retirement account with Prudential, where she had worked. She made no change to beneficiaries of that account. I am to receive an equal amount of the distribution from that account with my brothers. Had my mother truly wished to exclude me, she would have taken me off the Prudential account.
>
> . . . .
>
> Several instances since [Virginia's] death have confirmed that David is acting in bad faith. Neither of my brothers informed me that she was in poor health, nor did they contact me when she passed away. I only learned of [Virginia's] death from a friend in New Jersey who saw her obituary. I had always kept my brothers informed during any medical issues [Virginia] had.

Sandra Kohler—Sandy—also submitted a certification in which she claimed to enjoy a "very close relationship" with Virginia. Kohler attested David fired home health aides who were assisting Virginia at an unspecified

6

time after Virginia's July 2014 hospitalization, and that David and his girlfriend moved into Virginia's house. Kohler claimed David told Virginia "she needed to stay away" from Kohler and "got angry" with Virginia "if he found out she was speaking with [Kohler] on the phone." She, too, said David changed the locks. Kohler's certification continued:

> As a result, [Virginia] had to sneak phone calls with me. She told me that she was afraid of David and his girlfriend. I had planned to come to visit [Virginia], but David would not allow it. [Virginia] told me that David told her that if she didn't stop talking to me that they would put her in a nursing home and threatened to stop taking care of her. She told me that she wished to go to heaven and would cry.

> . . . .

> During these conversations, she would ask me how her son James was doing. She knew that we kept in touch. She said that she missed him and wanted to see him. There was no indication that she was mad at James. [Virginia] did say that her son Michael was saying negative things about James and telling her rumors based on things he saw on social media. I assured her that these things were not true and that James was fine.

> . . . .

> At one point, [Virginia] told me that David wanted her to make him her power of attorney. She told me that her will would not change and that I would remain executor. She again told me that she wanted her sons to share and share alike with things to be split

7

equally. She didn't want them fighting over her estate. She did mention that she wanted me to have something of sentimental value. We spoke about a gold bracelet which she had. And she wanted my daughter Laura to get her great grandmother's engagement ring so that it would stay in the family. [Virginia] never told me that a new will had been signed in 2016, but remained clear that her sons should share equally in her estate.

Although we do not countenance the trial court's meager analysis of this issue, we are satisfied it properly found James failed to establish undue influence. James's unsupported allegations are based on his belief. Most of the alleged conduct is untethered to any timeframe. Likewise, Kohler's allegations do not specify time periods. Moreover, none of the allegations concern undue influence over Virginia's choices regarding the terms of the 2016 will.

In short, James's proffer does not establish a confidential relationship between David and Virginia. It is not enough to demonstrate that a beneficiary who stood to benefit from the will had a close relationship with the decedent. In re Will of Liebl, 260 N.J. Super. 519, 528-29 (App. Div. 1992). Rather, there must be some showing that the decedent was particularly vulnerable to undue influence. Ibid. If the decedent was strong-willed, managed her own affairs, her own finances, and was otherwise mentally competent, no presumption of undue influence arises. See ibid. Moreover, the proffer does not establish

suspicious circumstances surrounding the preparation and execution of the 2016 will.

James offered no evidence to refute the circumstances attested to by the attorney who drafted the will after a private consultation with Virginia in her home, read the will aloud to Virginia, and had his sons witness her execution. Although Virginia was in a short-term rehabilitation facility for treatment of back problems at the time the will was executed, the attorney certified she "was clear-headed, alert and strong-willed, just as she had been when [counsel, during the year prior,] represented her in . . . [a] zoning matter." Counsel averred:

> At the time I initially met [Virginia], a year or so before she signed her [w]ill on January 11, 2016, she made a point of telling me about her long career in the legal field as a legal secretary, paralegal and notary public, and it was clear to me throughout my representation of [Virginia] that she had an excellent understanding of the significance and importance of legal proceedings and legal documents . . . including the [w]ill which I prepared for her[.] She knew what she wanted in her [w]ill and she, and no one else, controlled its contents. It was always apparent to me that [Virginia] was a strong, independent woman who was not under the influence of anyone else when it came to her [w]ill.

"Summary actions are, by definition, short, concise, and immediate, and further, are 'designed to accomplish the salutary purpose of swiftly and effectively disposing of matters which lend themselves to summary treatment.'"

A-4560-18T3

MAG Entm't, LLC v. Div. of Alcoholic Beverage Control, 375 N.J. Super. 534, 551 (App. Div. 2005) (quoting Depos v. Depos, 307 N.J. Super. 396, 399 (Ch. Div. 1997)).  Inasmuch as a party in a summary action proceeding is not entitled to favorable inferences such as those afforded to the respondent in a summary judgment motion, O'Connell, 306 N.J. Super. at 172, the trial court correctly found James raised no material issue to warrant further proceedings.

James produced even less proof that Virginia lacked requisite testamentary capacity to execute the 2016 will.  In considering the issue, courts must consider if the decedent was able to "comprehend the property [she was] about to dispose of; the natural objects of [her] bounty; the meaning of the business in which [she was] engaged; the relation of each of these factors to the others, and the distribution that is made by the will."  Livingston's Will, 5 N.J. at 73.  "[A]s a general principle, the law requires only a very low degree of mental capacity for one executing a will."  Liebl, 260 N.J. Super. at 524 (quoting In re Will of Rasnick, 77 N.J. Super. 380, 394 (Cty. Ct. 1962)). "[T]he burden of establishing a lack of testamentary capacity is upon the one who challenges its existence . . . . [and] must be [proven] by clear and convincing evidence." In re Estate of Hoover, 21 N.J. Super. 323, 325 (App. Div. 1952).

10

James's and Sandy's accounts of Virginia's mental condition while hospitalized in 2014 are accompanied by James's lay diagnosis that he "thought that, at the very least, she was suffering from some form of hypochondria. But given her state while at the hospital, [he] thought that a psychiatric evaluation was definitely needed." Kohler averred David cancelled a scheduled psychiatric evaluation. Setting aside David's averment that Virginia's mental state, including "hallucinations, paranoia and general rapid decrease in cogence," that she experienced during her 2014 hospital stay was a one-time occurrence and was caused by an "allergic reaction to dilaudid which remained in [Virginia's] medical history as an allergy," there is no evidence that single incident continued past her release from the hospital, and certainly at the time she executed the will in 2016. See Livingston's Will, 5 N.J. at 76 (holding testamentary capacity is to be tested at the date of the execution of the will).

Furthermore, James's claim that Virginia suffered from dementia, is not tethered to the time when the will was executed. The mere reference of dementia in Virginia's 2019 death certificate does not establish her testamentary capacity in 2016. Again, James's proffer does not refute counsel's certification regarding Virginia's competency when she signed the will. And, James's contention that if Virginia were of sound mind, she would have noticed the misspelling of her

mother's name is without sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).  Virginia's eye condition at the time the will was executed required counsel to read the will terms aloud; she could not have noticed a misspelling under the circumstances.  In any event, a simple spelling mistake does not demonstrate that Virginia did not understand the nature of her property or the transaction she was engaging in.  See In re Last Will & Testament of Dietz, 41 N.J. Eq. 284, 289-90 (Prerog. Ct. 1886) (noting that the mere fact that the decedent misspelled the words "eighteenth" and "eighteen" was not determinative that he lacked testamentary capacity at the time he executed the will).

James's proofs were insufficient to establish that there was a genuine issue as to any material fact.  R. 4:67-5.  As such, the trial court correctly struck the caveat and admitted the will to probate.

Our determination obviates the necessity to address James's contention, relying upon Rule of Professional Conduct (RPC) 3.7(a), that the trial court erred by failing to disqualify David's counsel, who also consulted with Virginia, prepared the 2016 will, and attended to its execution.  Further, we find no merit in James's argument that the RPC applied during the order-to-show-cause proceeding.  That proceeding was not a trial; and RPC 3.7(a) provides:

12

[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the [lawyer's] testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client.

David's counsel did not meet the RPC's criteria for disqualification at that proceeding.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13