This is an appeal from an order of the Essex County Orphans Court, entered April 9th, 1948, admitting to probate the document offered as the last will and testament of Morris Alper, deceased. The proponent, Theresa Alper, is a daughter of the testator, as is the caveatrix, Goldye A. Shapiro. *Page 530 
In the court below the caveat was sought to be sustained, both in the "Grounds of Caveat" and in the testimony adduced by the caveatrix, on the ground that the will was the product of undue influence exerted upon the testator by his daughter Theresa, she being named in the will as the largest single beneficiary and as the sole executrix. After a very searching trial of the facts heard by Advisory Master Alfred C. Clapp, to whom the contest was referred by the Essex County Orphans Court, the conclusion reached was that the offered will was not the product of any undue influence. In its opinion the Orphans Court expressed the view that the provisions in the will in favor of the proponent (she was to receive 40% as against 60% to the other beneficiaries) were not unnatural in view of "the attentions and care which Theresa gave to her father."
The testator made his will on May 4th, 1939. He died more than six years later, on July 12th, 1945. In his will he devised all his real estate, described in the will by specific location, to seven of his eight children and to the children of an eighth child. That eighth child is the daughter Goldye, the appellant herein. The said real estate was devised to them in the following stated proportions:
To Theresa Alper (daughter) an undivided 40%.
To Jerome Alper (son) an undivided 5%.
To Pearl Alper (daughter) an undivided 10%.
To Cele Weitzman (daughter) an undivided 5%.
To Mildred Alper (daughter) an undivided 10%.
To Nathaniel Alper (son) an undivided 10%.
To Harold Alper (son) an undivided 10%.
To Theresa Alper, as trustee for Lauretta Shapiro, Elaine Hinda Shapiro, Roberta Shapiro and Roslyn Shapiro (children of the daughter Goldye A. Shapiro) an undivided 10%.
It is undisputed that for about 16 or 17 years preceding his death the testator suffered from cardiac disease, bronchial disturbance, hernia and other physical disorders. No claim has been made that any of these ailments in any degree affected the testator's mind or impaired his memory. In fact, the testimony shows that one of his sons, a practicing lawyer, prepared and submitted for execution by the testator a power *Page 531 
of attorney and a deed of conveyance several times within a few weeks of the latter's death, the last time being the night before the testator died. The only medical testimony in the case was furnished by Dr. Edwin Steiner, who treated the testator for about 16 years next preceding his death. Concerning that witness the Orphans Court in its opinion expressed its strong impression of his veracity. The doctor testified that the testator's mind was very acute and free of disturbances and that this healthy state of mind continued throughout all the years up to the time of death. The medical proof also established that at all times up to the occurrence of death the testator's blood pressure was "perfectly normal." On cross-examination the doctor was asked whether the bodily ailments from which the testator was suffering left him less liable to resist outside influences. The medical opinion was that those bodily ailments in no way affected the testator's mind. It was also established that throughout the years of his physical disability the testator kept in his own handwriting books of account relating to the management of several tenement houses from which he was receiving a monthly rental yield, that he was a reader of the daily press and read with regularity the liturgy of his faith. The Orphans Court described the testator as "a man of some will power," and there exists in my mind no doubt that despite his feebleness of body the testator was at the time of the making of the will a person of sharp mind and unimpaired mentality and that this condition continued unchanged to the time of his death. It is also significant that in the contest over his will, which was fought with great bitterness by those dissatisfied with its terms, there has been no suggestion of testamentary inadequacy. The contest was limited strictly to undue influence charged against the daughter Theresa.
At the time of the testator's death his daughter Theresa was about 49 years of age. Until she was about 33 years of age she worked at various employments, the earnings of which were turned over to her parents. In April of 1929 the mother died and Theresa took over the management of her father's home. He never remarried. From that time until his death, 16 years later, she did the shopping, cooking, *Page 532 
mending and cleaning required of the family, which consisted of her father and those of the children who remained at home until their respective marriages. That this was a considerable task would appear from the fact that at the time the mother died the household consisted of the father and six children and the homestead contained ten rooms. In addition to these domestic duties, she ministered to her father's needs, he being already an invalid. She prepared his meals, and as his illness progressed took care of bathing, dressing and feeding him. She also attended to his business needs, his income being derived from some tenement houses. Theresa supervised the making and repairs and personally did the collecting of the rents. The testimony shows that she herself performed manual labor in relation to these tenement houses, cleaning out and fixing up vacant apartments so as to make them presentable for renting. Occasionally she herself would do the painting of the flats and perform minor plumbing and carpenter work. On the whole, she not only ran a large household but also conducted her father's only business, that of managing cold water tenements. Her devotion to him was constant. In the winter of 1937-1938, while in Florida, he became seriously ill and remained there in a hospital for about six weeks. She immediately went to Florida and while there cooked his food for him and brought it to the hospital, thereby enabling him to eat according to the Hebrew dietary laws. She was more than a housekeeper; she was her father's practical nurse. As early as 1926 she had taken a course in hygiene and practical nursing and bedside care and sterilization. During the 16 years that Theresa ministered not alone to her father but to all the children who remained at home, those children either went to business or pursued professional studies, and eventually each of those other children was married and founded his or her own separate home, with the single exception of the son Harold, who, though married, seems to have remained at home except for a period of absence in the military service. While the other children were at home they enjoyed opportunities which somehow seem to have been denied to Theresa. In 1928 both parents went to Europe for about three months, taking with them the son Jerome. *Page 533 
In 1929 the father went to Florida and took with him his daughter Pearl and his son Nathaniel. In 1931 he again went to Europe and took Nathaniel with him. In 1933 he made a third trip to Europe, this time taking his daughter Mildred with him. Theresa was never taken on any of these holidays but was promised future consideration.
Theresa never married. We need not speculate about the reason for this, for it is not an unknown thing for a daughter so to devote herself to the interest of a parent as to make that interest a paramount influence and purpose in life. That the father was not insensible to Theresa's devotion and service appears from the lips of the disinterested witnesses. He talked to Dr. Steiner about Theresa. He said that he was concerned about her because she was the only one in the family that was really alone with no means of taking care of herself, and he told the doctor that he wished to make provision for her. He spoke of her as the girl "who was taking care of all his needs day and night, with no chance of enjoyment of anything, because she was taking care of him all the time." The doctor testified that during the 16 years that he treated the testator Theresa had acted as his nurse and cook and that the testator had told him that "this girl was everything to him; that she had taken care of him all her life, and nobody of the rest of the family took the same care of him that she had." It might also be noticed that the testator told his physician that he got no pleasure out of his other children, that he had no confidence in his sons, and that the only one that ever did anything for him was his daughter Theresa. To his cousin, Mrs. Faerberg, the testator mentioned in 1943, while in the hospital recovering from a fracture of the hip, that his children other than Theresa did not see him very often. He said: "She is a very good girl. She gave her life for me. I am worried about her. The other girls are married; they have homes, children; they have families; and Theresa hasn't got it. But I provided for her; I took care of her; so if I go she won't have much worry." He told Mrs. Faerberg that because Theresa had been better to him than had his other children, he had made better provision for her. To his attorney, Golden, who prepared his *Page 534 
will, the testator stated that Theresa had taken care of him for years, that she was his nurse, that she prepared his food and took care of his tenement houses, and that he felt he wanted to give her financial security so that she could without fear for her future devote herself entirely to sustaining his life. He told his attorney that his daughter Theresa had been devoting her entire life towards preserving his own and that he therefore wanted to give her whatever portion of his estate was required to make her secure after he had passed on.
I find nothing in the voluminous record to impeach the proven fact of Theresa's unselfish love and devotion to her sick and widowed father and his very realistic appreciation of the fact. What he did in his will seems to me to be an act of simple justice. He not only rewarded her for the years of service that she had given him but he was mindful of her unfortunate situation, a daughter without home, husband or child and without a profession or calling or source of livelihood other than the limited means of earning something as a practical nurse. He virtually said so in his will when in the ninth clause thereof he explained the inequality of distribution of his estate by saying that he wished to divide his estate in such proportions as he deemed expedient "on the basis of the financial needs and requirements of my respective children and grandchildren." What the testator really did was to take a little from the shares of his seven other children and add it to Theresa's portion, with the result that each of them lost little but her share was appreciably increased. This was pointed out in the Orphans Court opinion, where that court said that taking into account the attentions and care which Theresa had given to her father, the will was not unnatural, for if it failed of probate the eight children would each take 12 1/2% of the estate, "a share not much larger than that which half of them take under it."
I agree with the Orphans Court. The will is neither unnatural nor unjust. This is not to suggest that a testator may not dispose of his estate unnaturally or unjustly, but in the instant case neither criticism may be levelled at this will. This testator, as every testator, must be held to be the sole and final judge as to the manner of the distribution of *Page 535 
his earthly estate amongst those who are the natural objects of his bounty. It is not the function or right of any court to obtrude itself into the heart or mind of a testator and determine for him which of his children, if any, shall be favored and to what extent, or that he should treat them all alike. It is for him and him alone to weigh those circumstances and influences which in his own mind and conscience justify such variances in bounty as he chooses to donate. This is true where the reason for the variances does not appear; a fortiori where the reason is so abundantly present.
I am now brought to a consideration of the defensive proofs. Several of Theresa's brothers and sisters testified that Theresa was a domineering person, that she would occasionally exhibit outbursts of temper, and that a number of times when she quarrelled with her brothers or sisters the testator would plead that there be peace in the house. It is insisted that on one occasion she opposed the plan of one of her sisters being married at home, making it necessary to conduct the wedding at a caterer's establishment. I see nothing in this that bespeaks any overpowering influence. Nor is such influence to be found from the fact that Theresa opposed another daughter being married at home. Quite the contrary. She denies such opposition, but even if it occurred it was ineffectual, for that wedding was held at home. Here surely Theresa's will did not prevail. In their effort to show her dominant influence the caveatrix and her witnesses went to the extreme of absurdity. An instance was pointed out where one of the testator's tenants wished to have one or two rooms painted, to which the testator assented, that Theresa countermanded the father's order and the work was not done. This Theresa denied, but even if it were true it in no way supports the charge of any overpowering influence. She was the manager of the tenements and it may well be that her view, taken in the interest of economy, was finally persuasive with the testator, else he could have directed one of his sons to see to it that the work be done notwithstanding Theresa's objection. I believe her testimony, that she never countermanded her father's orders and that his word with her was law. I refuse to believe that this girl, who according to the evidence, *Page 536 
loved her father tenderly, would have taken any position to vex him. I incline to the view that the instances of distemper on the part of Theresa, which she denies, amount, if true, to nothing more than what may be found in most families where there are many children — differences and quarrels of no serious meaning, quickly erupted and as quickly mended. There is, however, one bit of testimony from the lips of the son Harold which cannot be overlooked. It shocked the Orphans Court and it distresses me. The son Harold, called by the caveatrix as a witness in the Orphans Court, stated that the testator had said to him that Theresa wants to poison him and that that statement disturbed the witness greatly. Cross-examination elicited from witness the fact that he did not believe the statement and, what is more important, that the witness was living at home, eating of the same cooking which Theresa prepared for the father and the other members of the family. Theresa, who was not said to have been present when this alleged statement was made by the testator, was of course in no position to deny her brother's testimony. In the opinion of the Orphans Court it is pointed out that this testimony concerning poisoning had been completely ignored in the careful brief submitted in behalf of the caveatrix. No wonder Advisory Master Clapp said that he was left with the impression that the caveatrix' witnesses were heavily coloring the facts to suit their own ends, and he furnished as one illustration the said testimony concerning poisoning. I regard this assault on the character and filial devotion of Theresa as resting on nothing more than a base fabrication and it shows to what lengths an avaricious legatee will go in his efforts to undo a more favored beneficiary.
The will in question was drawn by Mr. Golden, a Newark lawyer. The beginning of his engagement is to be found in an earlier conversation between the testator and his physician, Dr. Steiner. Some few months before the will was executed and on the occasion of a professional visit by the doctor at the testator's home, the daughter Theresa was present. The testator requested her to leave the room and while she was absent he stated to the doctor his desire to do something for his daughter who had been taking care of him "day and *Page 537 
night." The doctor suggested a will and the testator replied that he didn't want his sons to draw his will. Thereupon Dr. Steiner suggested that he select a lawyer who could come to the house and draw a will for him and that he, the testator, would not have to attend at the attorney's office. After the doctor left the testator told Theresa of the doctor's suggestion; that he, the testator, didn't want any of his sons to draw the will, and he cautioned Theresa to say nothing about the matter because "there will be plenty of trouble later. At least I don't want it now." The testator asked that his friend Philip Senzer, a real estate man, be sent for. Thereafter Senzer called upon the testator with the scrivener, Golden, and introduced the latter to the testator. Mr. Golden conferred alone with the testator and received his instructions for the preparation of a will. Three drafts were prepared by Golden and there were quite a few conferences between the testator and the scrivener. These activities covered a period of about six weeks to two months. When the will was finally executed there were present in the room only the testator, the attorney, Mr. Golden, and the two attesting witnesses, Rabbi Konvitz and a Dr. Kaufman. Both attesting witnesses were dead at the time of the trial in the Orphans Court and the will was initially proved by their signatures affixed to the attestation clause, which showed full compliance with our statutory requirements concerning the execution of wills. Upon that proof, together with the proof of the testator's signature and the fact of death, the proponent rested. An attempt was then made to undermine the proof of due execution. Jerome Alper, one of the testator's sons practicing law in Newark, testified that following his father's death and the reading of the will he, together with the caveatrix and another sister, called at the home of Dr. Kaufman, one of the attesting witnesses. Over objection he was permitted to testify concerning an alleged declaration by that attesting witness. That declaration was to the effect that when that witness was at the home of the testator on the afternoon the will was executed, he heard the attorney, Mr. Golden, and the other witness, Rabbi Konvitz, arguing with the testator, that the testator was saying that he didn't want it that way *Page 538 
and that Rabbi Konvitz assured the testator not to worry and to sign, that the testator declined to sign and that finally "they" took the testator to a corner of the room where he signed the instrument. Jerome Alper also attributed to the deceased attesting witness the statement that the argument had lasted two and a half hours and that it had tired out the testator to the point where he gave in and signed. This testimony was subsequently stricken by the Orphans Court as inadmissible and as having been erroneously received. Like testimony from those who, it is alleged, accompanied Jerome on his visit to Dr. Kaufman was offered and excluded. That ruling is on this appeal alleged to have been erroneous and it is argued before me that because the testimony is physically in the record (though stricken therefrom by the ruling of the lower court) I should receive that testimony as admissible proof. Some very early authorities are cited in appellant's brief to sustain the admissibility of such evidence, though patently it is of the fabric of hearsay. I shall view the question in its alternative aspects in relation to admissibility.
Appellant has argued in this court that the attestation clause of a will certifies not alone to the fact of execution but impliedly to the further fact that at the time the will was executed the testator was free of all restraints. Assuming, but not deciding, that the rule is as broad as stated, the question presented is whether an attesting witness may be permitted to impeach that which has been certified to in the attestation clause or that which is said to be implicit therein. Notwithstanding the few old cases cited by appellant, this court is of the opinion that that may not and should not be permitted. In the case of In re Rein, 139 N.J. Eq. 122; 50 Atl. Rep.
2d 380, an attesting witness to a will admitted her signature to the attestation clause but disclaimed the events certified therein. This court there said in its opinion:
"It would be a most deplorable condition if wills could be overthrown either by the forgetfulness or the perfidiousness of witnesses in whom the testator reposed confidence and who reduced to a permanent memorial in the shape of an attestation clause the facts attending the execution of the will. In *Page 539 re Halton, 111 N.J. Eq. 143; 161 Atl. Rep. 809, Vice-Ordinary Berry expressed the view that a witness' repudiation of his own attestation clause is destructive of any weight which his testimony otherwise might have had and he quotes from text to the following effect: `And, as a matter of law, a person who as a subscribing witness goes upon the stand and upon his oath asserts to be false that which in the execution of the will he, by a most solemn act, asserted to be true, deserves to be discredited, and is worthy of but little belief.'
"Vice-Ordinary Berry in the Halton Case mentions the opinion of Lord Mansfield in Warrington v. Shelley, 1 T.R. 297, 300, to the effect that a subscribing witness impeaching his own act is deserving of the pillory."
If, as this court has said in the cited cases, a subscribing witness endeavoring to impeach his attestation deserves to be discredited, what shall be said concerning the like conduct of an attesting witness already deceased? In the former case those interested in obtaining probate are not rendered entirely helpless to meet the attempted impeachment. They have at least the opportunity of cross-examination. Not so where those bent upon preventing probate allege impeaching declarations as having come from lips thereafter sealed by death. Those adversely affected by such declarations have not the opportunity of cross-examination, and to allow such declarations into the case is to engraft upon the hearsay rule a further exception which will indeed render the execution of a will an insecure proceeding and will furnish temptation to fraudulent imagination. For these reasons I hold that the declarations of a deceased attesting witness which conflict with the facts certified to or which are implicit in his attestation clause are not admissible in evidence and that the declarations of Dr. Kaufman were properly excluded by the Orphans Court.
Assuming, however, that the objections to the alleged declarations by Dr. Kaufman go to the weight rather than the admissibility of the evidence, appellant's cause is not in any way advanced. I shall consider that evidence as though it merited reception. If, as this court said in the Halton and *Page 540 Rein Cases, supra, such testimony from a living witness, where there is the opportunity of cross-examination, "is worthy of but little belief," how much more so where the alleged declarant is dead and his declarations cannot be subjected to the test of cross-examination. I do not believe that Dr. Kaufman made the declarations attributed to him. Such conduct cannot be squared with the circumstance that following the testator's death Dr. Kaufman swore to an affidavit on October 27th, 1945, that he heard the testator publish his last will and testament, that the testator was then of sound and disposing mind, that Joseph Konvitz, the other subscribing witness, was present at the same time with the deponent when the will was signed by the testator, and that both witnesses signed their names as attesting witnesses in the presence of the testator and of each other and at the request of the testator. The alleged conversation between Jerome Alper and Dr. Kaufman is given as of October 25th, 1945. I refuse to believe that two days later Dr. Kaufman would have made the affidavit in evidence, in support of the application for probate, if there had in fact occurred the events embraced in his alleged statement or if he had in fact made the statement attributed to him. It seems to me that Dr. Kaufman's affidavit of October 27th, 1945, completely negates the alleged declarations of October 25th, 1945. Then, too, the alleged declaration concerning the conduct of Rabbi Konvitz is inherently improbable. What interest did Rabbi Konvitz have in influencing the testator to sign the will? The rabbi was no beneficiary. Nor has it been shown that he had any relation to or interest in any of the beneficiaries of the will. It has not even been shown that he had any greater acquaintance with the daughter Theresa than with any other members of the testator's family. But more important than all these considerations is the fact that the substance of the alleged declaration perishes in the face of the positive proof of a living witness to the execution of the will. The attorney, Golden, who was the scrivener of the will and was present at its execution and who is now the only living witness to the testamentary act, was asked directly whether he had had any difficulty in getting the testator to sign the *Page 541 
will. His answer was that the testator's mind was made up and that he wanted to sign that will and that "there wasn't the slightest reticence or reluctance on his part on the occasion of May 4th when he executed this will." He was then asked whether some pressure had not been used on the testator and his answer was that that "is a lot of humbug." The witness Golden has no stake under the will or in the result of this litigation. I prefer to believe him against the improbable declaration of the deceased witness, Kaufman. I therefore hold that the will in question was the voluntary act of the testator, that it was the third draft prepared at his request, that it represents due reflection, and that it was executed without influence from any person whomsoever. Nor should there be overlooked the circumstance, as was pointed out in the Orphans Court opinion, that after the execution of the will the document was retained by the testator for the next six years of his life, "a period during which he kept the possession of his faculties." It would have been simple for him to destroy it if he had not been satisfied with it. In re Bartles, 127 N.J. Eq. 472, 476."
There is evidence that in one of the earlier drafts of his will the testator left 30% to Theresa. Theresa testified that she did not know the contents of her father's will until it was opened after his death. The scrivener Golden, however, testified that he made the change from 30% to 40% in favor of Theresa because of the testator's statement that Theresa was not satisfied with 30%. Thus there would appear to be some conflict between Theresa's testimony and that of Mr. Golden. It may well be that the testator assumed that Theresa would not be satisfied with 30% and stated as a fact that which was merely an assumption. Yet if it be the fact that the testator informed Theresa of his intention to leave her 30% and she expressed dissatisfaction, that would not amount to any undue pressure or influence on her part. If he chose to discuss with her the provisions he contemplated in her favor, she was free to express her opinion as to their sufficiency. She and he were at all times free to do more than that, to enter into a binding contract that for her continued service to him he would make a will leaving her 40% *Page 542 
or whatever other consideration they mutually assented to. Such agreements are specifically enforceable. The Orphans Court considered this question of the increase from 30% to 40% and said: "I am satisfied that the 40% provision was not what he wanted at first and that it was only included in the will because Theresa urged it strongly. However, his free agency was not so put upon as to have been destroyed, that is, nullified; an assent to that which is urged by another is not vitiated by undue influence, where the assent is voluntary." I concur in that view.
I am now brought to the evidence concerning moneys given by the testator to his daughter Theresa in the years 1944 and 1945 with which she purchased bonds, some in the joint names of her father and herself and others in her name alone. In this connection I must also consider the transaction by which he transferred to her in 1945 the title to the home on Van Ness Place in the City of Newark. The circumstances concerning the transfer of the real estate were clearly furnished by the witness William K. Flanagan, a member of the bar of this State recognized both for his ability and his probity. He prepared the deed and brought it with him to the testator's home. The testator appeared mentally alert and Mr. Flanagan explained to him in English the contents of the deed, to which the testator assented. Present was a woman who translated to the testator in Jewish the clauses of the deed as read by Mr. Flanagan. In the course of this transaction the testator remarked to Mr. Flanagan that his daughter Theresa was a good girl. Mr. Flanagan explained to the testator that if he conveyed the property to his daughter his ownership of it was gone. He said he understood the matter. Mr. Flanagan saw to the execution of the instrument and attended to its recording. During his visit with the testator and the execution of the document Miss Alper was not present in the room. I have not the slightest doubt that this was a voluntary gift, intended by the testator to assure to his daughter a home for herself and added security for the day when he would be gone. No differently can I regard the transfers of the moneys used to purchase bonds as he instructed. There isn't the slightest bit of evidence that *Page 543 
these transfers were attended by any act from which can be spelled out undue influence, and it certainly will not be presumed. It does seem significant that a very goodly portion of the bonds were purchased in the joint names of father and daughter. These purchases were made by Theresa herself and was certainly not the conduct of one who wished to gather into her own purse the securities so purchased. Nor did these transfers result in any impoverishment of the donor. He retained and died seized of the tenement houses which he had owned for a great many years and which were the sole source of his revenue. Had he under the same circumstances attending the execution of the will in question made a will leaving his entire estate to his daughter Theresa, that will would have been sustainable. He never went that far. He favored her with a 40% provision, and as the years went along and she grew older, he supplemented it with giftsinter vivos. These transfers of real estate and funds were made five to six years after the testamentary act. In that interim there had been no gifts or transfers. The Orphans Court considered those transactions and pointed out that they occurred five years or more after the will was made. Advisory Master Clapp said that those transactions had not altered his conclusion that the will was not the product of undue influence. I agree and add that those transactions were not only voluntary but too remote in time to the testamentary act to be of any persuasive relevancy thereto.
This appeal was submitted under a stipulation. Attached to that stipulation are records of bond purchases made by Theresa. In addition thereto appellant offered in evidence before me photostat copies of bonds and bond records relating to bond purchases and redemptions by Theresa Alper, both in her own name and in the joint names of herself and her father, but all from 1944 forward. Objection was made to this evidence being received on the ground that the same was available in the court below and was not there used. Respondent relies on rule 93 of the rules of the Prerogative Court, which provides that on an appeal from the Orphans Court to the Prerogative Court such appeal shall be decided solely upon the transcript of the evidence and proceedings *Page 544 
before the Orphans Court, provided that the appellate court may, in its discretion, permit additional testimony, not available inthe Orphans Court. The evidence now offered was in the hands of the proctors for the caveatrix on or before December 20th, 1947. The letter exhibits attached to the stipulation plainly show that the caveatrix attempted informally to get that evidence before the Orphans Court after the hearings were concluded but while the cause was under advisement. This was objected to by proponent. By letter of December 24th, 1947, the advisory master in the Orphans Court afforded to the caveatrix an opportunity to offer the evidence by making application, on notice, to reopen the cause. The decision in the Orphans Court was made on on February 11th, 1948. In the interim of over seven weeks the suggested application was not made. I therefore hold that under rule 93 of our rules the evidence may not now be received. If the testimony were received and considered it would have to be treated the same way as I have regarded the evidence which was before the Orphans Court relating to the Van Ness Place property conveyance and to bond purchases, voluntary transfers made by the testator, some to his daughter and some to himself and his daughter jointly, with no proof in the case that these transfers were the result of any undue influence. The proffered evidence embraces some like evidence that was received in the Orphans Court. All of that evidence is of the same character and leads to the same conclusion, that of voluntary conduct on the part of the testator and also too remote in point of time to the testamentary act of five or six years prior thereto.
In her brief on this appeal appellant asserts that Theresa concealed the making of the will and after it was made concealed its existence. This claim is not supported by the proofs. There was nothing that Theresa did concerning the will which was not in obedience to her father's wishes. It was he who wanted to keep the fact of his will unrevealed until some period of time following his death, whether 30 or 60 days matters not. When he first consulted Dr. Steiner and was advised by the physician to make a will, the testator stated that he did not want his sons, who are lawyers, to *Page 545 
draw the instrument. When he told Theresa of what had passed between Dr. Steiner and himself, he cautioned her to say nothing about the matter, for he wished no trouble presently and predicted that there would be plenty of trouble later. After the will was executed he himself placed it in a safe to which he had access, and he said to Theresa: "Don't disclose this. In the first place, I don't want you to breathe a word of it to any of your brothers or sisters. And when you do tell them after a time, don't show it until after 30 days after Shloshim," that is, after the traditional 30-day period of mourning observed by orthodox Hebrews. Theresa did not have the combination of the safe at the time and it was not given to her by her father until some time in 1944. The testator's purpose to keep the fact of his will unrevealed to his other children during his lifetime appears clearly from the testimony of the sons Jerome and Harold, to the effect that on one occasion in 1943 and on another occasion in 1945 the testator stated that he had made no will and that he didn't believe in wills. I doubt very much that he made those statements, but if he did, they were quite in harmony with his purpose to keep the fact of his will a secret from those in whom, as he stated, he lacked confidence. If the testator at any time since May of 1939 informed either Jerome or Harold that he had made no will, then that statement was obviously untrue. Yet it is the kind of an untruth which a testator might well indulge himself for reasons of privacy and for the sake of avoiding presently the importunities of dissatisfied relatives. I deem it significant that the fact of the existence of the will was revealed by Theresa herself. She did this at the close of the seventh day of the mourning period, when she heard her brothers discussing a plan of selling all the real estate. It was that discussion which precipitated her revealing the will sooner than the 30-day period that I have already mentioned. All these facts were considered and weighed by the Orphans Court and led to its finding that "it [the will] was retained by him [the testator] during the next six years of his life." I concur in that finding. The will was not concealed by Theresa. Such concealment as was present was by the testator himself. *Page 546 
Advisory Master Clapp expressed in his opinion his sense of shock at the plan furthered by one or two of the testator's sons, which plan was that the testator convey shortly before his death all his real estate to his daughter Theresa and that they obtain from her an executed deed with the names of the ultimate grantees omitted. I agree with the Orphans Court that the obvious purpose of this scheme was to avoid the payment of transfer inheritance taxes. This finding must of necessity contribute towards the discredit of those who conceived the plan. So determined were they in their purpose to effectuate the plan that within a short time before the testator's death, the son Nathaniel, together with a lawyer by the name of Durham, who had his office with Jerome Alper, visited the testator twice for the purpose of having him execute the deed in question. The very night before the testator died Durham visited the testator's home for the purpose of obtaining execution of the deed. The testator was then already too feeble for Durham to attempt to procure execution of the instrument.
The order of the Orphans Court is found to be without error and is affirmed. Considering the case de novo on the record and proofs here submitted, the result is reached that the will in question was not the product of any undue influence and its admission to probate is approved. *Page 547