IN THE MATTER OF THE APPEAL FROM THE PROBATE OF THE ALLEGED WILL OF ROBERT LIVINGSTON, DECEASED.

ELSIE LIVINGSTON GELLERT, PLAINTIFF-APPELLANT, v. GERTRUDE A. LIVINGSTON, DEFENDANT-RESPONDENT.

Argued March 27, 1950—Reargued May 22, 1950—Decided June 19, 1950.

*Mr. Raymond G. Betsch* argued the cause for the appellant.

*Mr. George G. Tennant, Jr.,* argued the cause for the respondent.

The opinion of the court was delivered by

ACKERSON, J.   The primary question for decision is whether the will of Robert Livingston, executed November 4, 1937, is void because of undue influence alleged to have been exerted upon the testator by his surviving wife, Gertrude A. Livingston.

The appeal is taken from a judgment of the Bergen County Court, Probate Division, which held that the aforesaid will was not the product of undue influence and affirmed the order of the Surrogate of Bergen County admitting it to probate. The contestant, Elsie Livingston Gellert, daughter of the decedent. appeals from this judgment in so far as concerns the issue of undue influence and also with respect to the amount of the counsel fee awarded to her, payable out of the estate.   The proponent, Gertrude A. Livingston, takes a cross-appeal with respect to the allowance of any counsel fee as

well as an item of costs awarded by the court to the contestant. That portion of the judgment holding that the will of the decedent was duly executed in accordance with the formal statutory requirements is not questioned here by the plaintiff, Elsie L. Gellert.

The case was certified by this Court on its own motion while it was pending in the Appellate Division.

The will in controversy was executed by the testator in the law offices of Blake and Voorhees, New York attorneys, on November 4, 1937. By the second article of this writing he bequeathed and devised all his property to his wife, Gertrude, if she should survive him; and provided further, that should she predecease him, the entire estate was to go to his children of a former marriage, Robert, Jr., and the contestant, Elsie, in equal shares with further provisions concerning survivorship.

The decedent, Robert Livingston, died on February 19, 1948, in the City of Englewood, his home town, at the age of 79 years, leaving him surviving the proponent, Gertrude A. Livingston, and the aforesaid Elsie and Robert, Jr. The sole asset of the estate is 250 shares (out of 500 shares outstanding) which testator owned in the Robert Livingston Realty Corporation which he formed in 1929 to hold title to a valuable piece of real estate he had purchased in 1916 situated on the corner of Dean Street and Palisade Avenue, Englewood, on which location he conducted a prosperous stationery business for many years. When the old wooden structure on this site was destroyed by fire in 1936, the decedent erected a modern store and office building, known as the "Livingston Building," to replace it.

Testator was twice married. His first wife died in 1921 leaving three children of the marriage—Elsie, the eldest, Robert, Jr., and Don. The last named was killed as a result of an accident in 1926. In the same year—1926—the decedent married his second wife, Gertrude Nelson, a widow, who had two sons of a former marriage, Frank and Wallace. The testator retired from active participation in the stationery business in 1926 and left its management to his son, Robert, Jr.

(or "Bus" as he was called). In December of 1926, the decedent and his wife, Gertrude, took possession of a new home he had purchased at 221 Sunset Avenue, Englewood, and Elsie, who was also married in 1926, moved into the old homestead at 172 Palisade Avenue upon the request of the decedent.

During the period from 1924 to the time of his death in 1948, the decedent executed seven wills, including a codicil executed in 1941. All but the first two were prepared by the same New York law firm—Blake and Voorhees. The first of these wills dated August 8, 1924, directed the executors named therein to continue to operate the stationery business and to divide the net profits equally among the three Livingston children. The homestead on Palisade Avenue he devised to his daughter Elsie and the balance of the estate to and for the benefit of his children. After his second marriage in 1926, several wills were executed which are not in evidence. However a will, dated January 29, 1936, was placed in evidence, and, after specific bequests to testator's wife and children, it gave the income of the residue (including the Livingston Building) which was placed in a trust, to Gertrude Livingston for life and upon her death, the principal was to be equally divided between Elsie and Robert, Jr., with further provisions concerning survivorship.

In the spring of 1937, the stationery business known as Robert Livingston, Inc., managed by Robert, Jr., encountered financial difficulty and went into voluntary bankruptcy in June–July, 1937, and was saved by the efforts of the testator who arranged an advantageous settlement with the creditors. On June 9, 1937, testator and his wife, Gertrude, deeded the 172 Palisade Avenue house to Elsie subject to a mortgage of $2.000 which Elsie paid off. She then sold the house for $4,000 and moved away from Englewood. Other *inter vivos* transfers were made about this time. To his son, Robert, Jr., decedent gave his entire interest in the stationery business, and to his wife, Gertrude, he transferred his interest in the Sunset Avenue property which was their home from the time of their marriage in 1926 until the testator's death in 1948.

In July, 1937, Mr. Livingston decided to make a new will and a letter to Mr. Blake, his attorney, dated July 3, 1937, in the handwriting of his wife but signed by the testator, stated that in view of the aforesaid *inter vivos* transfers, he wanted certain changes made in his will. The will prepared from the instructions contained in this letter was executed on July 15, 1937. The original of this will was not produced and its contents are not disclosed. Four months later, on November 4, 1937, the testator made his final will which is the subject of this litigation. The proponent made the appointment for the signing of this will at the request of her husband and was present at its execution. The will gave all of the testator's estate outright to his wife, Gertrude, provided she survived him, and designated her as sole executrix. At the time of the execution of this will Mrs. Livingston also executed a will providing that in the contingency of her surviving her husband, all of her shares in the Robert Livingston Realty Corporation were to go to his children. Proponent had acquired the other 250 shares outstanding in the real estate corporation by gifts of two blocks of stock from her husband in 1937 and 1938.

On the 18th of June, 1941, the testator executed a codicil to the November, 1937, will. It provided that in the event of his wife, Gertrude, predeceasing him, the stock which he owned in the Robert Livingston Realty Corporation was to be placed in trust to pay the income therefrom in equal shares *per stirpes,* to the use of his children, Elsie and Robert, Jr., until such time as all his grandchildren had either died or reached the age of 30 years, and at that time the principal was to be divided among his descendants then living—the codicil was not offered for probate since the contingency did not occur.

The mutual wills executed by the decedent and his wife on November 4, 1937, were kept in the custody of the New York attorney who held them until 1943 when proponent wrote to have them forwarded to New Jersey.

The first point presented on this appeal is that because of the confidential relationship existing between the sole bene-

ficiary and the testator, her husband, taken in conjunction with "other slight circumstances" tending, as it is claimed, to indicate imposition, there arose a presumption of undue influence which shifted to said legatee, proponent herein, the burden of proving that no such undue influence was practiced on the testator.

The legal presumption is that the testator was of sound mind and competent when he executed the will. *In re Craft's Estate*, 85 *N. J. Eq.* 125, 130 (*Prerog.* 1915) ; *In re Babcock*, 106 *Id.* 228 (*Prerog.* 1930) ; *In re Raynolds*, 132 *Id.* 141, 147 (*Prerog.* 1942). The burden of proving undue influence is upon the person asserting it and it must be clearly established. *In re Raynolds, supra, p.* 147 ; *In re Heim*, 136 *N. J. Eq.* 138 (*E. & A.* 1944) ; *In re Nixon, Ibid.* 242 (*E. & A.* 1944) ; *In re Bottier*, 106 *Id.* 226 (*Prerog.* 1930) ; *In re Strang*, 109 *Id.* 523, 527 (*E. & A.* 1931).

The mere existence of a confidential relationship between the testator and the beneficiary does not alone create a presumption of undue influence. *In re Neuman*, 133 *N. J. Eq.* 532, 535 (*E. & A.* 1943). This is especially true in husband-wife relationships. 2 *Page on Wills*, § 822, *p.* 627 ; § 818, *p.* 619.

There must be, in the case of wills, some additional facts or circumstances in support of the allegation of undue influence in order to cast the burden of proof upon the beneficiary ; *In re Nixon, supra, p.* 244 ; *In re Heim, supra; In re Neuman, supra.* Accordingly, it has been held that "slight circumstances" or indicia of undue influence in addition to a confidential relationship, is sufficient to shift this burden. These circumstances are enumerated in the cases. See *In re Raynolds, supra, p.* 148 ; *In re Heim, supra; In re Morrissey's Will*, 91 *N. J. Eq.* 480 (*Prerog.* 1920) ; *Sparks' Case*, 63 *Id.* 242, 247 (*Prerog.* 1901). Also: 1 *Clapp, Wills and Administration in New Jersey*, § 34, *pp.* 65-70 ; *Note:* 154 *A. L. R.* 583, 584 *et seq.*

These additional circumstances are claimed by the contestant to be present in the instant case. They are said to

consist in (1) a plan or design of the proponent, from the inception of the marriage, to acquire all of her husband's property upon his death by the gradual attempt to estrange him from his family and by the imposition of the stronger dominating influence of Gertrude upon her easy-going and mentally enfeebled husband; (2) the initiation of proceedings by the wife for the preparation of the will; (3) her solicitude and participation to see that the will was prepared and executed; (4) the preparation of the will by Mrs. Livingston's attorney; (5) the presence of said wife at the execution of the will; (6) the drawing of the will in her favor; (7) the taking of possession of the will by her; (8) the concealment of the making the will, and (9) the unnatural disposition made by the will.

The law is settled that no presumption of undue influence arises if either spouse makes a will in the other's favor. The influence which a wife exercises by virtue of her kindness, love and affection whereby the husband is caused to make a will in her favor, excluding his children, is no ground for refusing to probate the will. The courts are extremely hesitant to shift the burden of proof upon the wife to show that she was not guilty of exercising undue influence even where these "slight circumstances" exist. 2 *Page on Wills*, § 822, pp. 627–628; 57 *Am. Jur.* (*Wills*), § 359, p. 263, § 399, p. 286. *Cf. In re Raynolds, supra,* pp. 148, 149.

From the evidence produced, as will presently appear, we are not satisfied that the circumstances or indicia are sufficiently strong to raise a presumption of undue influence against the wife so as to shift to her the burden of proof upon that question. They merely demonstrate the natural tendencies and influences existing between man and wife. With such a close relationship undue influence is not easily presumed.

The dispositive question is whether the plaintiff has satisfied the burden of proving that the will of her father, Robert Livingston, was the result of undue influence practiced by his wife.

■ Not all influence is "undue" influence. Persuasion or suggestions or the possession of influence and the opportunity to exert it, will not suffice. It must be such as to destroy the testator's free agency and to constrain him to what he would not otherwise have done in the disposition of his worldly assets. The coercion or domination exercised to influence the testator may be moral, physical, or mental, or all three, but the coercion exerted upon the testator's mind must be of a degree sufficient to turn the testator from disposing of his property according to his own desires by the substitution of the will of another which he is unable to resist or overcome. *In re Brengel's Will*, 85 *N. J. Eq.* 487 (*Prerog.* 1915); *In re Neuman, supra, p.* 534; *Schuchhardt v. Schuchhardt*, 62 *Id.* 710 (*Prerog.* 1901). Each case of this nature must be governed by the particular facts and circumstances attending the execution of the will and the conduct of the parties who participated in order to determine if the coercion exerted was "undue." *In re Raynolds, supra, p.* 152; *In re Nixon, supra, p.* 245.

■ In this State the gauge of testamentary capacity has been stated to be whether the testator can comprehend the property he is about to dispose of; the natural objects of his bounty; the meaning of the business in which he is engaged; the relation of each of these factors to the others, and the distribution that is made by the will. *In re Heim, supra, p.* 148; *In re Rein*, 139 *N. J. Eq.* 122 (*Prerog.* 1946).

While in certain situations, a surviving spouse may be guilty of exerting undue influence over her husband to make a will in her favor, the law recognizes that on account of the closeness and natural influences exerted between man and wife, greater freedom in urging mutual claims should be allowed in the consideration of undue influence than in any other type of relationship.

In the case of *In re Raynolds, supra*, which has a remarkable resemblance to the one *sub judice*, the court had occasion to say at *p.* 153:

"And while it is true that suggestions or persuasions do not amount to that influence which is frowned upon by the courts, an even greater

latitude is allowed between a husband and wife by virtue of the sanctity of the marital relationship than is allowed between any other class of persons."

Specifically the contention made by the contestant is that the decedent was under the complete domination of his wife in all matters; that she made his decisions and influenced him because of the hold she had on him to make an unnatural disposition of his property. The contestant seeks to throw suspicion on the proponent because of the role Mrs. Livingston played in the preparation of the will and the negotiations with the lawyers. Plaintiff raised the point that Mrs. Livingston took decedent to her lawyer to draw the will. The record shows, however, that Mr. Blake (of Blake and Voorhees) was a resident of Englewood whom decedent had known for many years. Actually the suggestion that testator go to Mr. Blake for the preparation of the will came from the testator's older brother, Alexander Livingston. Mr. Birtwhistle of the firm which attends to the renting of the testator's real estate testified he told decedent that he served on a board of bank directors with Mr. Blake and thought he would do all right to draw a will.

The plaintiff drew attention to the fact that the correspondence with Mr. Voorhees previous to the drawing of the 1937 will was carried on by Mrs. Livingston though the letters were signed by Mr. Livingston. There was testimony that he "hated to write letters" and his wife acted as his secretary, taking his dictation, then writing the letters longhand or typing them for him to read and sign. Some of the letters to Mr. Voorhees were signed by her but since there were to be mutual wills drawn, she desired information for herself as well as for her husband.

Attention is drawn to a letter of October 20, 1937, written by Mrs. Livingston to Mr. Voorhees concerning the provisions her husband wanted made in his will and mentioning certain changes to be made in her will. In reference to the will of the testator she wrote, "Will the fact that there is no mention in it of his children, give them any chance to fight it?" But the

letter continues to say that "Mr. Livingston gave his daughter, June last, the house, and all the furniture in it, that she lives in; and he gave his son the shares of Robert Livingston, Inc. Should the will mention that having given his son and daughter what he wished them to have, the entire estate left at his death is to go to his wife * * *. This may not be necessary but Mr. Livingston wishes me to ask you about it."

Mrs. Livingston's will is not in evidence but a letter to Mr. Voorhees previous to the drawing of the mutual wills is in evidence in which letter the following statement appears: "If Mr. Livingston survives me, I wish all my shares of Robert Livingston Realty Corp. to go back to him, but if I survive him, then they go to his children."

At the trial Mrs. Livingston testified that Mr. Blake, in accompanying them to the elevator after the signing of the mutual wills, remarked "Well, it is all yours now, and you can do as you damn please." She need not have volunteered this as neither Mr. Blake nor her husband, both then deceased, could have given such testimony. She went on to add that Mr. Livingston answered: "Yes, it is all hers." If this had not been Mr. Livingston's wish and purpose, he could have so indicated to Mr. Blake.

It is evident that in 1941 when testator went alone to the offices of Blake and Voorhees to have a codicil to his will drawn that he understood the disposition of his property made in the 1937 will and could have made any desired changes.

In a letter written in Mr. Livingston's handwriting to Mr. Voorhees, dated June 12, 1941, the testator asked: "Does it [the codicil] insure everything going to Mrs. Livingston if I predecease her? If it does the codicil is okay * * *." Mrs. Livingston testified she did not know of the existence of this letter until after her husband's death when Mr. Voorhees showed it to her.

That testator did not disclose the making of the will to his children does not constitute concealment, but rather a lack of confidence in them. His will was kept in the possession of the New York attorneys who prepared it, from 1937 to 1943,

and testator at any time during that period could have requested its return and destroyed it if he had not been satisfied with it. *Cf. In re Alper,* 142 *N. J. Eq.* 529, 541 (*Prerog.* 1948); affirmed, 2 *N. J.* 104 (1949).

The point of time at which testamentary capacity is to be tested is that of the execution of the will. *In re Strang, supra.* Undue influence, to vitiate a will, must be operative at the time the will is executed. *In re Raynolds, supra, p.* 151; *Whitenack v. Stryker and Voorhies,* 2 *N. J. Eq.* 8 (*Prerog.* 1838); *Turner v. Cheesman,* 15 *Id.* 243 (*Prerog.* 1857).

A review of the voluminous record convinces us that the decedent was capable and competent at the time when the will in question was executed, November 4, 1937, to exercise his own independent judgment in selecting those who were to succeed to his property upon his death. It is shown for instance that in June of 1937, Mr. Livingston attended several conferences with creditors of the stationery business managed by Robert, Jr. The testimony of several of the creditors there present was to the effect that the testator actively participated in the negotiations, and showed shrewd business acumen and the ability to make his own decisions. Mr. Voorhees, who prepared the will under consideration and the codicil thereto in 1941, testified that he considered the testator entirely competent to make a will. Mr. Voorhees, and two other witnesses to the signing of the will, said that they saw no sign of any influence brought to bear on Mr. Livingston and that they were of the opinion that he was of sound mind, memory and understanding on that occasion. The proponent's proofs also disclose that the decedent kept records of expenses in his own handwriting for the period from 1916 to 1943. The accountant who prepared his tax returns and had known testator for some 27 years testified that Mr. Livingston was fully capable to form his own judgments and handle his own business affairs. Doctor Hoffman, a member of the clergy, testified that he had known Mr. Livingston for 22 years and that except for the last four or five years of his life, the decedent was qualified

to handle his own affairs. Testator's dentist testified that during the period in which the will was executed, the decedent had a well-balanced mind and powers of decision.

The evidence shows that Mr. Livingston actively participated in the construction, details and financing of the new Livingston Building in the winter and spring of 1934 and 1935; and that he handled various matters concerning this building such as insurance, leases, and its administration. Mr. Birtwhistle of the firm of Birtwhistle and Livingston, the rental agency for the Livingston Building, testified that from the time the will in question was executed and up to 1945, when deceased became ill and started to slip, he was a man of decision and made up his own mind though he was easy-going.

The absent-mindedness or forgetfulness of the decedent does not disclose a lack of testamentary capacity. His mind was not enfeebled and from the sagacity and wisdom with which he transacted his business and personal affairs during the period in question, his testamentary capacity seems well established. Old age and failure of memory do not of themselves necessarily take away a testator's capacity. *Whitenack v. Stryker and Voorhies, supra; In re Rein, supra.* A moderate capacity is all that is required. *In re Phillips,* 139 *N. J. Eq.* 257, 261 (*Prerog.* 1947).

It is said that the testator excluded from his will the natural objects of his bounty and affection, namely, his children. But he had contributed to their well-being during his lifetime by *inter vivos* gifts, and, undoubtedly, recognizing that his widow would be in greater need than his son, or his daughter who was younger and married, he concluded that he ought to give the remainder of his property outright to his wife who had loved and cared for him and made him a happy home for many years, rather than tie up his estate by a trust as he had done in an earlier will. *Cf. Black v. Foljambe,* 39 *N. J. Eq.* 234, 244 (*Prerog.* 1884). It must be remembered in this connection that at the time of the signing of the will in question Mrs. Livingston also made her own will leaving all the

shares in the Robert Livingston Realty Corporation to her stepchildren to the exclusion of her own children.

A letter written (March 16, 1948) by Mrs. Livingston while ill in bed to Elsie following her father's death reads as follows:

"Dear Elsie:

"This afternoon I had a good talk with Bus. I had hoped to talk to you too before Mr. Tennant sent the copies of your father's will but he acted too promptly for me.

"When I read the will, I could understand what your reaction to it might be. I have known that Father would leave me the income from the building for my life time but it was a shock to find he had left it to me as he did.

"When I die, the building will go to you and Bus by my will. Only my home and personal belongings will go to Frank and Wallace.

"Bus has expressed his full trust and faith in me and I hope I will have your confidence too that I will do the right thing."

(We note that Bus did not join his sister in contesting the will but sided with his stepmother.)

This letter, while not true in the statement that Mrs. Livingston was ignorant of the provisions of her husband's will, we regard as an attempt to avert the delays and expenses of a law suit and of little weight in determining the questions of the decedent's testamentary capacity or the exercise of undue influence by proponent in the making of the will in 1937.

The findings of the trial court on the issues of testamentary capacity and undue influence, though not controlling, are entitled to great weight since the trial court had the opportunity of seeing and hearing the witnesses and forming an opinion as to the credibility of their testimony. 2 *Page on Wills*, § 690, *p.* 314 *et seq.; Rule* 1:2–20(a).

We conclude, from the record before us, that the decedent was entirely competent to execute the will in question and that it was not the product of undue influence.

We have also examined into the question of the allowance and amount of the counsel fee and cost of transcript awarded to the plaintiff and find no reason for disturbing the judgment with respect thereto.

The judgment below is affirmed.

*For affirmance*—Justices CASE, OLIPHANT, BURLING and ACKERSON—4.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER and WACHENFELD—3.