10 N.J. Super. 208 (1950)
76 A.2d 901
IN THE MATTER OF THE ESTATE OF JOSEPH GOTCHEL, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1950.
Decided November 2, 1950.
*210 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. Edward V. Martino argued the cause for appellant.
Mr. Edward A. Tanski argued the cause for respondent.
The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
The judgment of the Camden County Court, Probate Division, is not printed in appellant's appendix. Appellant's counsel stated at the oral argument he assumed the judgment was entered as a matter of course by the County Clerk and did not appreciate his responsibility in that circumstance to incorporate a copy of it in the appendix he filed with this court. This is not an acceptable explanation in face of the plain and unambiguous provision of Rule 1:3-1 which makes explicit the obligation of appellant that he "shall print as part of his appendix in all causes the judgment, order or determination appealed from or sought to be reviewed or enforced." In addition, this court has previously had occasion to direct the attention of the bar to this requirement. Dilione v. Vogel's *211 Department Store, 2 N.J. Super. 85 (App. Div. 1949). Appellant has supplied the court, since the argument, with a copy of the judgment entered March 23, 1950. We might well dismiss the appeal, but inasmuch as it was fully argued we shall accept it. We are not to be understood, however, after this further reminder, to be disposed to do so on all future occasions.
The appeal requires a determination whether the County Court properly affirmed the order of the Surrogate of Camden County admitting to probate the will, executed in due form September 8, 1949, of Joseph Gotchel, who died October 24, 1949, at the age of 78; appellant contends the will is void because of lack of testamentary capacity in the testator and because of undue influence alleged to have been exerted upon testator by his son, Peter Gotchel, the sole beneficiary under and executor of the will.
Joseph Gotchel, of foreign birth, came to this country in 1907. He lived in Camden and made his living as the proprietor of a neighborhood store in the dwelling which was his home. He spoke little English but used the Russian tongue and could speak and understand some Polish. He apparently prospered moderately; he owned his home and store and some other property.
Peter always lived with his father, as did his wife Harriet from the time of her marriage to Peter in 1935. Decedent had three other children, Harry, the contestant, and Laura, both of whom were married and maintained their own homes and survived him, and Rose, a daughter who had died August 19, 1949, just two months before the testator's death.
The proofs show that the testator was unquestionably enfeebled physically for some months before his death by the infirmities of old age; his decline was particularly rapid after the death of Rose, whose loss caused him great shock and grief.
Harry contends his father was of unsound mind when he executed his will on September 8, 1949, only twenty days after the death of Rose, and that, in any event, a confidential relation existed between Peter and his father creating a presumption of undue influence casting upon Peter the burden of *212 proof to show the absence of such influence, which burden, Harry argues, Peter did not meet.
The applicable legal principles are fully discussed and considered in Mr. Justice Ackerson's opinion for the Supreme Court in Gellert v. Livingston, 5 N.J. 65 (1950), and accordingly no elaboration of them is required. See also In re Anna Filo's Will, deceased, 9 N.J. Super. 146 (App. Div. 1950).
The testator is presumed to have been of sound mind when he executed his will. Harry completely failed to sustain the burden upon him to prove the contrary. The old gentleman was forgetful at times, untidy in his personal dress and habits, absent minded, mislaid things, committed errors in making change for purchases in his store, and on the occasion of his daughter's burial on August 24th seemed not to recognize members of his family and old friends; this last is plainly explicable by his grief in his daughter's loss; the other lapses are common to many, young or old, and certainly understandable in one of his years. "Old age and failure of memory do not of themselves necessarily take away a testator's capacity," Gellert v. Livingston, supra, 5 N.J. at p. 77. He was physically but not mentally enfeebled; the proofs show he was fully capable of comprehending his property, its disposition, the natural objects of his bounty and the significance of what he was doing when he made his will, which time, of course, is the point at which his testamentary capacity is to be tested.
Undue influence must be such as to destroy the testator's "free agency" and to constrain him to do what he would not otherwise have done in the disposition of his property. In re Neuman's Estate, 133 N.J. Eq. 532 (E. & A. 1943). The person asserting it normally has the burden to prove clearly its existence. It is not presumed solely from the existence of a confidential relationship between testator and beneficiary, although "slight circumstances" or indicia of undue influence in addition to a confidential relationship will shift the burden to the beneficiary to show its absence. Gellert v. Livingston, supra, 5 N.J. at p. 71.
So, standing alone, the fact of Peter's long residence *213 with his father did not raise the presumption; this fact may have supplied an inference of motive and opportunity, but motive and opportunity alone do not constitute sufficient proof. "It must be made evident that the motive was pursued and the opportunity actually so employed as to destroy the free agency." In re Anna Filo's Will, deceased, supra. The appellant, Harry, contends that the burden shifted to Peter because Harry proved in addition to the existence of the confidential relationship that (a) in 1945 a purchase money mortgage was taken in Peter's name when the father sold a house; (b) in the summer of 1949 the father gave Peter's wife $2,110 in cash; (c) the father expressed fear of Peter because Peter beat him. There was ample evidence to justify the trial court's finding that the inferences sought to be drawn by appellant from these proofs were completely refuted. The 1945 purchase money mortgage was one of two such mortgages taken by the father in the name of one of his children; the other, apparently taken before 1945, was in Rose's name; the interest on both mortgages was received by the father in his lifetime, collected usually by Peter's wife, Harriet, and turned over to the father; as the proofs stand, the inference is the transaction was one intended and fully understood by the father. The $2,110 was given not to Peter (he was at sea at the time) but to Harriet, and she used some of it to pay the father's taxes and bills; it also appeared the old gentleman hoped he would avoid income taxes by giving the money to Harriet. The proofs of the alleged beatings are meagre and, while not expressly denied by Peter when he testified, too unsubstantial to credit in light of the other proofs in the record of the long standing affection between Peter and his father; too, one of the witnesses who testified the father told him Peter had beat him was the divorced husband of the deceased daughter, Rose, and he admitted an unfriendly feeling for Peter because of Peter's interference when Rose and the witness had their disagreement.
If, however, we should accept Harry's contention that the circumstances, unfavorable to Peter, make a case which raises the presumption, the proofs offered by Peter, as the *214 trial court found, completely rout the presumption and show that the will was initiated by decedent and expresses his testamentary design. We need not stand alone on Peter's categorical denial that he influenced his father. See In re Eatley's Will, 82 N.J. Eq. 591 (Prerog. 1913). Rose had died intestate. The resultant difficulties in the handling of her estate troubled the father and his family. Laura visited him on Labor Day and asked him why he didn't make a will, because in handling Rose's affairs, she said, "Pop, I have so much trouble, why don't you make a will that this won't happen again." The father spoke to Peter a few days later, on September 8th, and told him he wanted to make a will "because of the trouble with Rose's property." He asked Peter to accompany him to the office of Edward A. Tanski, a member of the New Jersey bar, who had known the decedent and his family for upwards of thirty years; they went, at the father's suggestion, first to the office of his doctor and then to Mr. Tanski's office. Mr. Tanski speaks both Russian and Polish and the conversation between him and the testator, overheard by Mr. Tanski's law clerk who also speaks Russian and Polish, was in those languages. Peter asked whether he should stay and was told by the father, "Stay here." The father told Mr. Tanski his desire to make a will leaving everything to Peter after providing for his funeral expenses. Mr. Tanski testified that the testator, while visibly enfeebled physically, manifested no deterioration of his mental powers and conversed intelligently about all details. Mr. Tanski drafted the will while the testator waited and in the presence of his law clerk translated it from English to Russian and Polish, interrogating the testator as he did so until satisfied that the will fully expressed the testator's desire and intent. The will was executed by the decedent and attested by Mr. Tanski and his law clerk. Peter remained silent throughout.
It is claimed that Peter suppressed the will and failed to divulge to either Harry or Laura the disposition made by it. Harry admits, however, Peter did tell him before their father's death that a will had been executed but did not tell him its contents. Peter admitted frankly that he said nothing about *215 the provisions of the will because he apprehended Harry and Laura would be displeased. This is understandable; and certainly it is not abnormal conduct on the part of the beneficiary in light of the other circumstances shown in the record.
The father seems not to have said anything to Harry or Laura about the will; he did, however, tell four friends and neighbors of many years standing all about it. He told Andrew Ponoch, a friend for 38 years, on the day the will was executed that he had made a will leaving everything to Peter and, when Ponoch asked why he did not provide for Harry, "He told me he likes Peter's wife and children, she keeps me when I am sick and she telephones the doctor, she brings me medicine and coffee, and keeps house and the store and that is the reason I signed;" "He said Harry comes about once a month to see me," and Laura "maybe a couple of weeks she come."
He told Martha Bagdonas, who lived across the street and had known the decedent for 35 years, who testified, "He always say my daughter-in-law (Harriet) was good to me;" that she asked him what he was going to do with the store and house and he said, "I am going to leave it to my son Pete and my daughter-in-law."
He told John Lanske, a friend of decedent from the time the latter came to this country in 1907, about two weeks before his death, "He told me he signed the house for Pete."
He told Katarina Russo, his next door neighbor for 26 years, who testified he "talked with me about Harriet, how good she is and she like the children and Pete * * * he say she is so good to me, she live all her life with me, and work for me and everything. He like her very much."
It is said the will is an unnatural one because no provision is made for Harry or Laura. The disposition is not anomalous in the circumstances proved "because of equal logic and reason is the inference that it was induced by the influence of kind intentions and care, naturally producing affection and good will." In re Anna Filo's Will, deceased, supra.
The judgment under review is affirmed, with costs.