**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3022-21

ANN CHRISTINE BARTEK,

     Plaintiff-Respondent,

v.

JOHN LoSAPIO, JR.,
Individually, and as
Executor of the ESTATE
OF JOHN LoSAPIO, SR.,
DECEASED, and 108 NORTH
STREET LLC, a New Jersey
limited liability company,

     Defendants-Appellants.

_____

         Submitted January 10, 2024 – Decided January 7, 2025

         Before Judges Gummer and Walcott-Henderson.

         On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. P-002484-16.

         Trautmann & Associates, LLC, attorneys for appellants (Gregg D. Trautmann, on the briefs).

Smith & Gaynor, LLC, attorneys for respondents (Thomas J. Gaynor, on the brief).

The opinion of the court was delivered by

WALCOTT-HENDERSON, J.S.C. (temporarily assigned).

Defendants John LoSapio, Jr. (Junior), sued in his individual capacity and as executor of the estate of his father, John LoSapio, Sr.'s (Senior), and 108 North Street LLC appeal from the Chancery Division's April 25, 2022 judgment in favor of plaintiff Ann Christine Bartek, in which the court, after conducting a bench trial, ordered that a copy of a January 14, 2016 codicil to the February 6, 2003 last will and testament of Senior, be admitted to probate and that the title to the remainder interest of property located at 108 North Street in Madison be "reconveyed."

Plaintiff, who was Senior's sister, had conveyed certain properties, including her residence in Madison, New Jersey at 108 North Street (the Madison Property), to Senior subject to a life estate retained by her.[1] According to plaintiff, Senior in January 2016 had executed a second codicil to his will at

---

[1] We were advised plaintiff passed away on December 24, 2023, during this litigation. The record does not disclose whether a motion for leave to file and serve an amended complaint was ever made to permit an Administrator Ad Prosequendum to pursue the action on behalf of plaintiff's estate. Pursuant to Rule 4:34-1(a), in the event of the death of a plaintiff, "the action does not abate."

A-3022-21

her request, stating those properties would be conveyed to the living residuary beneficiaries in plaintiff's last will and testament if Senior predeceased plaintiff. At the time of Senior's death, however, the 2016 codicil, was not admitted to probate along with Senior's will. Instead, Junior attested that no codicil existed. Thus, the remainder interest in the Madison Property was conveyed to Junior and 108 North Street LLC under Senior's will.

Plaintiff filed suit in the Chancery Division against defendants seeking a judgment directing, among other things, that a copy of the 2016 codicil be admitted to probate and the remainder interest in the Madison Property be reconveyed by defendants to the living residuary beneficiaries in plaintiff's will. Following a three-day bench trial, the court entered a final judgment in favor of plaintiff, ordering the codicil to be admitted to probate and title in the Madison Property be reconveyed. Defendants now appeal, contending the court erred in admitting a copy of the codicil to probate. For the following reasons, we affirm.

I.

The relevant facts are derived from the trial record and are substantially undisputed by the parties. In the late 1970s, plaintiff and her husband purchased the Madison Property and a property in Dover, New Jersey (the Dover Property). Plaintiff had resided on the Madison Property since 1978. Following the death

A-3022-21

of her husband in 2004, however, plaintiff became concerned with her financial security as she suffered from several medical conditions and feared her estate would be "wiped out with the cost of [her] long-term care."

Plaintiff sought estate-planning and asset-preservation services from Donald McHugh, an elder-law attorney. She first met with McHugh in 2005. Senior, with whom plaintiff "got along very well," accompanied plaintiff to her meeting with McHugh. At that meeting, McHugh explained there were certain techniques that would allow her to "qualify for Medicaid services."[2] In that regard, McHugh advised that it was standard practice for an individual to transfer the title of real property to a son or daughter who would inherit that

---

[2] To be eligible for Medicaid in New Jersey, an applicant must generally have $2,000 or less in resources. N.J.A.C. 10:71-4.5(c). ("[P]articipation in the program shall be denied or terminated if the total value of an individual's resources exceeds $2,000."). Resources include "any real or personal property which is owned by the applicant . . . and which could be converted to cash to be used for his or her support and maintenance." N.J.A.C. 10:71-4.1(b). If an applicant has disposed of assets within five years of applying for Medicaid or becoming institutionalized in certain facilities, the individual is ineligible for Medicaid's institutional level benefits. N.J.A.C. 10:71-4.10(a). The transfer of an asset for less than fair market value during the look-back period raises a rebuttable presumption that the asset was transferred for the purpose of establishing Medicaid eligibility. H.K. v. Dep't of Hum. Servs., 184 N.J. 367, 380 (2005) (citing N.J.A.C. 10:71-4.10(j)); see also 42 U.S.C. § 1396p(c)(1). To rebut that presumption, the applicant must present "convincing evidence that the assets were transferred exclusively (that is, solely) for some other purpose." N.J.A.C. 10:71-4.10(j).

property upon the individual's death while retaining a life estate in the property, thereby enabling the individual to continue residing at the property and to ensure the property would not be used to pay for medical expenses. Because plaintiff did not have any children, McHugh suggested plaintiff transfer the title to the Madison Property and Dover Property to a "trusted individual."

Plaintiff did not decide anything regarding her estate at that initial meeting with McHugh. Instead, she discussed her options with Senior. According to plaintiff, Senior agreed, subject to certain conditions imposed by plaintiff, to serve as plaintiff's "trusted individual" such that the title to the properties would be conveyed to him subject to the life estate retained by plaintiff. Those conditions were that (1) Senior would reconvey the properties back to plaintiff at any time plaintiff desired; (2) Senior would own the properties if she predeceased him; and (3) the residuary beneficiaries in plaintiff's will would own the properties if Senior predeceased plaintiff.

Plaintiff and Senior informed McHugh of this agreement. To effectuate the agreement, McHugh prepared a supplemental needs trust agreement, two deeds, and a codicil to Senior's will. The trust agreement was executed in March 2005 and listed plaintiff as the beneficiary and Senior as a trustee. The deeds

A-3022-21

were executed on December 12, 2005, and transferred the properties to Senior subject to plaintiff's life estate.

The first codicil was executed on December 16, 2005, in the offices of McHugh. The codicil stated it was the "only [c]odicil to [Senior's] Last Will and Testament dated February 6, 2003," and supplemented Senior's will by adding the following:

> My sister, [plaintiff], conveyed to me her propert[ies] in Madison and Dover, New Jersey, subject to a life estate retained by her. If I shall predecease her, I disclaim that ownership and direct that ownership of both properties shall pass under the residuary provisions of the Last Will and Testament of [plaintiff], subject to her continuing life estate.

In 2007, plaintiff decided to sell the Dover Property. Accordingly, she asked Senior to reconvey the property to her and asked McHugh to prepare the necessary deed. Senior agreed to reconvey the property to her, and the deed was executed on March 6, 2007.

Thereafter, Senior contacted Elliot Goldstein, the attorney who had prepared his February 6, 2003 will. Senior wanted to revise his will to provide, among other things, that his estate would not be inherited by his three children, but only by Junior. According to Goldstein, in the process of revising Senior's will, Senior did not mention any deeds concerning the Madison Property or

6

Dover Property, nor a codicil. Senior executed the revised will on January 9, 2009, at the offices of Goldstein.

The following year, Junior moved from Florida to Senior's home in Morris Plains after witnessing Senior fall a few times while visiting him. Junior's wife, Cherray LoSapio, subsequently moved there in 2011.

In 2015, Junior contacted Goldstein to prepare an advance medical directive for Senior, who had been spending increased amounts of time in hospitals and medical facilities due to physical infirmities. Goldstein sent the directive to Senior for his signature in December 2015. In 2016, Junior contacted James DeMartino, an attorney specializing in estate and long-term care planning, to provide services for Senior. Junior sought to have DeMartino provide Medicaid planning services for Senior because he was concerned that the cost of Senior's healthcare would deplete Senior's estate.

By 2016, plaintiff's physical condition had also worsened, and she again became concerned about having sufficient funds to pay for her healthcare and protect the Madison Property. She contacted McHugh to discuss the reconveyance of the Madison Property by Senior to her. McHugh advised against the reconveyance, pointing out that plaintiff "had already met the five-

year Medicaid look-back period" and the reconveyance would "start the five years all over again."

In the alternative, McHugh suggested a new codicil that would alleviate plaintiff's concerns. Accordingly, McHugh prepared a second codicil, which was executed at McHugh's offices on January 14, 2016. It is this codicil that is at issue in this appeal. That codicil stated it was the "only [c]odicil to [Senior's] Last Will and Testament dated February 6, 2003." It revoked Senior's codicil "dated February 9, 2006," and replaced it with the following:

> My sister, [plaintiff], conveyed her property in Madison, New Jersey to me during her lifetime, subject to a life estate retained by her. If I shall predecease her or upon my demise, I distribute ownership of that property, per capita and not per stirpes, to the living residuary beneficiaries in the Last Will and Testament of [plaintiff], namely, JOSEPH LO SAPIO, GABRIEL LO SAPIO, JR., NANCY SIBONA, VINCENT SIBONA, JR. and PATRICIA COREY.

That same day, McHugh faxed a copy of the codicil to Goldstein and gave the original codicil to Senior. To date, the original has not been located.

Despite the execution of the January 2016 codicil, plaintiff, in February 2016, asked Senior if he would reconvey the property to her. Senior agreed, and plaintiff asked McHugh to prepare the necessary deed. Plaintiff and Senior planned to execute the deed on March 29, 2016, at Morris Hills Center (MHC)

8

where Senior was undergoing physical therapy. On the evening before, however, Junior and Cherray confronted plaintiff in her home.[3] According to plaintiff, Junior said he would not let Senior sign anything and told plaintiff she was "going to do things [Junior's] way."

The following day, plaintiff fell ill so she asked her brother Gabriel LoSapio to bring the deed to Senior for him to sign. Gabriel and the notary public who had accompanied him were prevented from seeing Senior at MHC because Junior had restricted access to Senior. Thus, Senior did not sign the deed.

The following day, on March 30, 2016, Senior signed a deed prepared by DeMartino in connection with the Medicaid planning DeMartino had been providing. That deed conveyed Senior's home to Junior under a "care-giver child exception" to the five-year look-back period for Medicaid (the Caregiver Agreement).

When plaintiff and McHugh learned that Junior had prevented Senior from signing the deed to reconvey the Madison property, McHugh advised plaintiff to remove Senior as a trustee of her supplemental needs trust as he was

---

[3] We refer to Cherray and other members of the LoSapio family by their first names because they share the same last name. We intend no disrespect.

concerned Junior could "step in" for Senior. Plaintiff agreed, noting it was likely a good idea to remove Senior because he was "having problems physically and . . . trouble getting around." Accordingly, on May 5, 2016, McHugh sent a letter to Senior advising him that he had been removed as a trustee due to his "incapacity and/or inability to act." Sometime thereafter, plaintiff spoke to Senior again about reconveying the Madison Property, and Senior agreed to do so. On June 8, 2016, plaintiff, her niece, and Peter Thurkauf, a notary public, visited Senior at MHC where he had returned for physical therapy. This time they were able to see Senior, and he signed the deed reconveying the Madison Property to plaintiff.

Subsequently, Junior learned of the conveyance and filed suit against plaintiff and McHugh in his capacity as power of attorney for Senior, who was unaware of the lawsuit. Junior alleged plaintiff, McHugh, and others exerted undue influence over Senior, who was incapable of understanding the June 2016 deed when he signed it. Concerned about the physical toll litigation would have on plaintiff, McHugh advised plaintiff to settle the lawsuit by conveying the Madison Property back to Senior since the 2016 codicil would protect her. Plaintiff heeded McHugh's advice and reconveyed the property to Senior on October 14, 2016, and the litigation brought by Junior was terminated.

Less than ten days later, on October 23, 2016, Senior passed away. Thereafter, Junior probated Senior's 2009 will and attested there were no codicils to that will. He then conveyed forty percent of the remainder interest in the Madison Property to 108 North Street LLC and kept the remaining interest.

Plaintiff filed a two-count complaint in the Chancery Division against defendants in March 2017, for a judgment compelling the probate of the January 14, 2016 codicil to Senior's will and the creation of a constructive trust, alleging Junior had probated only his father's last will and testament and "wrongfully attested that there were no [c]odicils to the [w]ill."

The court conducted a three-day bench trial in September and October 2019. The court heard testimony from eight witnesses: Goldstein; McHugh; plaintiff; DeMartino; Thurkauf; Deborah McKay, a secretary at McHugh's law firm; Cherray; and Junior.

Goldstein testified about the services he had provided for Senior. He explained that he had prepared Senior's 2003 will and revised 2009 will. He testified that Senior had never mentioned any codicils or the deeds to the Madison Property and Dover Property. He further testified about the advance medical directive he had prepared for Senior in 2015. In that regard, he

11

explained he had spoken to Senior over the phone in the process of preparing that directive and Senior "sounded fine."  Moreover, Senior sounded "lucid," and Goldstein believed Senior was legally competent to sign the directive when Goldstein had sent it to him.

McHugh testified about the services he had provided to plaintiff and his observations of plaintiff and Senior.  He testified that his client was plaintiff, not Senior.  During his meetings with plaintiff and Senior in 2005, McHugh did not see any indication that plaintiff was pressuring Senior to sign the 2005 codicil, nor did he observe Senior "express any reason why he would not be competent" to sign the codicil.  McHugh further explained he was present for the signing of the 2016 codicil and Senior appeared "fine" and "he understood what he was signing."  McHugh testified that the reference to the "February 9, 2006" codicil in the 2016 codicil was a typographical error.  Further, McHugh explained Senior had not mentioned the revised 2009 will, which is why the 2016 codicil still referred to Senior's 2003 will.  He also testified that he had given Senior the original 2016 codicil and Senior never indicated that he had revoked or torn up that codicil.  Finally, McHugh testified that Senior's physical disability, rather than his mental capacity, was the justification for Senior's removal as trustee of plaintiff's supplemental needs trust.

Plaintiff testified about her experiences with McHugh and her relationship with Senior. She explained she had chosen Senior to help her with the properties because they got along very well and because she believed he was a trustworthy person. According to plaintiff, Senior's physical and mental conditions at the signing of the 2005 codicil, which she witnessed, were "[p]erfectly fine" and he "understood everything." Similarly, plaintiff testified that Senior's mental capacity was fine, "as always," when he signed the 2016 codicil. Moreover, she explained Senior had always told her that the Madison Property was hers and that he was willing to reconvey the property to her at any time. She explained Senior was "perfectly fine mentally" when he signed the June 2016 deed reconveying the Madison Property, and Senior had not indicated to her that he had ever revoked or destroyed the 2016 codicil. Plaintiff further explained that Senior was removed as trustee of her supplemental needs trust because he was having problems physically. She explained he was "physically incapable," but fine mentally.

DeMartino testified about the services he had rendered for Senior and his interactions with Senior and Junior. He explained that he had provided Medicaid planning services to Senior. He testified that he had discussed the Madison Property with Senior and explained it would be against Senior's interests to

reconvey that property because it would violate the five-year look-back rule. Nevertheless, Senior had called DeMartino roughly ten times stating he wanted the property to be transferred back to plaintiff. Indeed, DeMartino recalled Junior had expressed frustration over Senior's desire to reconvey the Madison Property to plaintiff. Finally, DeMartino testified he would not have prepared the Caregiver Agreement for Senior if he did not believe Senior was competent to sign it. According to DeMartino, in March 2016, Senior was "cognizant of what he was doing."

Thurkauf, the notary public, testified about Senior's signing of the June 2016 deed. He explained that he, Senior, plaintiff, and another witness were all present for the signing. Thurkauf testified that before Senior signed the deed, Thurkauf had read the title of the deed and its general terms to Senior and asked Senior if he wished to sign it.

Another witness, McKay, who was a secretary at McHugh's law firm, testified about Senior's signing of the 2016 codicil, which she had witnessed. She testified Senior "seemed fine" and that she recalled "nothing abnormal" about the signing.

Cherray testified about her observations of Senior's health beginning in 2011, when she moved into Senior's home, until 2016, when Senior passed away.

She explained that she noticed a definite decline in Senior's health during that time. She testified that Senior had trouble "getting around, walking" and he "seemed to have a lot of trouble making decisions." According to Cherray, conversations with Senior "increasingly became more difficult" over those five years because he "had trouble focusing." She testified Senior had Parkinson's disease and was diagnosed with dementia, although she could not remember when Senior received that diagnosis. She explained that she had helped Senior with his day-to-day needs by preparing meals for him and helping him around the house.

Cherray also testified about the evening of March 28, 2016. She explained that she and Junior had visited plaintiff at her home after Senior had asked them to talk to plaintiff about the Madison Property because he wanted plaintiff to stop asking him to reconvey the property to her. According to Cherray, plaintiff yelled and threatened them after they had explained it was not in Senior's best interest to reconvey the Madison Property.

Junior testified about his time living with Senior and his observations of Senior's health. He explained that he used to live in Florida but moved in with Senior in 2010 after he had visited Senior and witnessed him fall twice while doing yardwork. He testified that in 2010, Senior's mental capacity was not as

15

good as it used to be but that it got much worse over the next several years.  He explained Senior's cognitive abilities gradually declined until eventually they were "so far gone that you couldn't even hold a conversation with him because it would be a very tedious thing to keep him on . . . topic.  And he didn't quite have a good understanding of things."  According to Junior, Senior couldn't "grasp reality" during the last two years of his life.  Indeed, he explained Senior had been diagnosed with dementia and that Senior had spent the majority of the last year of his life in medical centers.  Junior, however, conceded that all of those medical stays were for physical issues, not mental ones.  Further, he admitted that a mental competency exam had been performed on Senior during one of those stays and Senior had passed the exam.[4]

Junior further testified about his and Cherray's visit with plaintiff on the evening of March 28, 2016.  He confirmed Cherray's account of the events and explained he had asked plaintiff not to have Senior reconvey the Madison Property because it would ruin Senior's Medicaid planning.  When plaintiff informed him that she was still going to ask Senior to sign the deed reconveying

---

[4]  Progress notes from MHC dated April 1, 2016, state staff at MHC informed Junior of Senior's competency exam results.  The notes indicate Senior was "competent and able to make his own decisions regarding his medical, financial and all other decisions."

A-3022-21

the property, Junior restricted who could visit Senior at MHC. He explained he had restricted access based on advice he had received from DeMartino.

On April 25, 2022, the court entered a final judgment in favor of plaintiff, directing that a copy of the 2016 codicil be admitted to probate and defendants to reconvey the remainder interest in the Madison Property.

The court's decision was supported by an eleven-page statement of reasons. The court explained that after "watch[ing] and consider[ing] the testimony and demeanor of all witnesses," it had found "all credibility determinations favored [plaintiff's] position." In that regard, the court found plaintiff's testimony to be "most credible and compelling" and "consistent with the documentary evidence." The court also found McHugh, Goldstein, DeMartino, Thurkauf, and McKay to be credible, noting their testimony "corroborated each other, [plaintiff's] testimony, and the documentary evidence." By contrast, the court found the testimony of Junior and Cherray contradictory and "largely not credible." The court explained neither Junior nor Cherray had any explanation for the contradictory documentary evidence showing Senior was competent in 2016.

Regarding the 2016 codicil, the court found it satisfied the requirements of N.J.S.A. 3B:3-2 and, therefore, was valid. In that regard, the court explained

17

McHugh had testified credibly and in detail about the codicil and Senior's testamentary capacity, and DeMartino had testified Senior contacted him approximately ten times in 2016 to ensure the Madison Property would be conveyed to plaintiff. The court concluded any errors regarding the date of the 2005 codicil and Senior's 2009 will did not revoke Senior's "unequivocal intent as expressed in the 2016 [c]odicil," which was "clearly executed" after Senior's 2009 will. Moreover, the court found the fact that the original 2016 codicil could not be located did not create a presumption that Senior had revoked the codicil. The court explained the "record was replete with testimony regarding the execution of the 2016 [c]odicil and its contents and the intent of both Senior and [plaintiff]."

The court also rejected defendants' contention that plaintiff had exerted undue influence over Senior. The court explained plaintiff and Senior never lived together and it was Junior who had a special relationship with Senior. In that regard, the court noted Junior had "power of attorney, and later an advance care directive and [the] caregiver agreement, regarding Senior." In short, the court found defendants had "failed to make a prima facie showing of undue influence."

Defendants appealed. The court submitted an amplification dated April 25, 2022, under Rule 2:5-1(b) in response to defendants' notice of appeal. The amplification stated, "[t]he court noted that it could not locate its file for this matter." In its amplification, the court clarified that its trial exhibits were incorrectly boxed with another trial file during the period of time court staff did not have access to the courthouse because of the COVID-19 Pandemic restrictions and resulting closure of the courthouses. The court, however, clarified that prior to making its decision, it was in possession of the entire file, including all evidence and its own trial notes.

## II.

We first address defendants' challenge to the validity of the January 14, 2016 codicil. Our review of a judgment entered following a non-jury trial is limited. See D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013); Accounteks.Net, Inc. v. CKR Law, LLP, 475 N.J. Super. 493, 503 (App. Div. 2023). "We may not overturn the trial court's fact[-]findings unless we conclude that those findings are 'manifestly unsupported' by the 'reasonably credible evidence' in the record." Balducci v. Cige, 240 N.J. 574, 595 (2020) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

This court also "defer[s] to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). By contrast, "[the] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference" and are reviewed de novo. Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

"[A] court's duty in probate matters is 'to ascertain and give effect to the probable intent of the testator.'" In re Prob. of Will & Codicil of Macool, 416 N.J. Super. 533, 539 (App. Div. 2010) (quoting Fid. Union Tr. v. Robert, 36 N.J. 561, 564 (1962)). Accordingly, the court must "look to the language of the will to determine if the testator expressed an intent as to how the property should be distributed." In re Est. of Hope, 390 N.J. Super. 533, 539 (App. Div. 2007). A will "includes any codicil and testamentary instrument that . . . revokes or revises another will." N.J.S.A. 3B:1-2; see also Kennedy v. Mockler, 38 N.J.

20

Super. 35, 48 (App. Div. 1955) (explaining that a codicil is a "republication of the will, as modified by the codicil itself").

"The findings of the trial court on the issues of testamentary capacity and undue influence, though not controlling, are entitled to great weight since the trial court had the opportunity of seeing and hearing the witnesses and forming an opinion as to the credibility of their testimony." Gellert v. Livingston, 5 N.J. 65, 78 (1950). The court's factual findings "should not be disturbed unless they are so manifestly unsupported or inconsistent with the competent, reasonably credible evidence so as to offend the interest of justice." In re Will of Liebl, 260 N.J. Super. 519, 524 (App. Div. 1992). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P., 140 N.J. at 378.

When analyzing whether the testator executed a will with the requisite testamentary capacity, the "gauge . . . is 'whether the testator [could] comprehend the property he [was] about to dispose of; the natural objects of his bounty; the meaning of the business in which he [was] engaged; the relation of each of the factors to the others, and the distribution that is made by the will.'" Liebl, 260 N.J. Super. at 424 (quoting In re Livingston's Will, 5 N.J. 65, 73 (1950)). Nevertheless, there is a "presumption that 'the testator was of sound

mind and competent when he [or she] executed [it]." Ibid. (quoting Haynes v. First Nat'l State Bank, 87 N.J. 163, 175-76 (1981)). Indeed, "the law requires only a very low degree of mental capacity for one executing a will." Ibid. (citation omitted); see also Livingston's Will, 5 N.J. at 77 (explaining that the testator's "absent-mindedness or forget-fulness [did] not disclose a lack of testamentary capacity"). "The burden of establishing a lack of testamentary capacity is on one who contests the will being offered for probate." In re Est. of Fisher, 443 N.J. Super. 180, 199 (App. Div. 2015).

N.J.S.A. 3B:3-2(a) addresses the technical requirements for wills, providing a valid will must be:

> (1) in writing;
>
> (2) signed by the testator or in the testator's name by some other individual in the testator's conscious presence and at the testator's direction; and
>
> (3) signed by at least two individuals, each of whom signed within a reasonable time after each witnessed either the signing of the will as described in paragraph (2) or the testator's acknowledgment of that signature or acknowledgment of the will.
>
> [N.J.S.A. 3B:3-2(a).]

Here, the court found the 2016 codicil satisfied the requirements of N.J.S.A. 3B:3-2(a) because it was signed by Senior, two witnesses — McKay

and Diane Sagendorf — and notarized by McHugh. Moreover, the court found Senior had possessed the requisite testamentary capacity.

Defendants contend the court's findings were erroneous, noting the original 2016 codicil could not be located, and the copy of the codicil does not refer to Senior's 2009 will but rather his 2003 will and a February 2006 codicil. They also argue Senior suffered from dementia and, therefore, did not possess the requisite testamentary capacity in 2016 when plaintiff sought for him to reconvey the Madison Property. In that regard, defendants rely on Junior and Cherray's testimony stating Senior had been diagnosed with dementia and argue that the May 5, 2016 letter sent by McHugh to Senior regarding Senior's removal as trustee of plaintiff's supplemental needs trust highlighted Senior's "incapacity and/or inability to act."

As a preliminary matter, we are satisfied the documentary evidence and testimony found credible by the court demonstrate the 2016 codicil satisfied the requirements of N.J.S.A. 3B:3-2(a). The codicil was signed by Senior and by two witnesses at the offices of McHugh, and McHugh notarized the signatures. Although the codicil does not refer to Senior's 2009 will, McHugh testified that was simply because Senior had not mentioned to McHugh that he had updated his will since the execution of the 2005 codicil, which referred to Senior's 2003

will. McHugh also testified the codicil's reference to a February 2006 codicil was a typographical error and that there was, in fact, no February 2006 codicil. Even if these errors constituted deficiencies in the formality of a writing intended to serve as a will, we have dispensed with technical formalities to effectuate the testator's intent. See In re Est. of Ehrlich, 427 N.J. Super. 64, 72-74 (App. Div. 2012).

Here, Senior reviewed and signed the 2016 codicil at McHugh's offices well after execution of his 2009 will. Moreover, the testimony of DeMartino, Senior's attorney whom the court found credible, reflected Senior's intention for the Madison Property to be reconveyed to plaintiff. DeMartino testified Senior had called him approximately ten times in 2016 stating he wanted the Madison Property transferred back to plaintiff.

Further, the fact that the original 2016 codicil could not be located did not create a presumption that Senior had revoked it. See Ehrlich, 427 N.J. Super. at 75 ("[T]here is no requirement in N.J.S.A. 3B3-3 that the document sought to be admitted to probate must be an original."). As the court noted, there was no evidence presented indicating that Senior had revoked or destroyed the 2016 codicil. McHugh and plaintiff testified that Senior had never indicated to them

that he had revoked the codicil. We therefore agree with the court that defendants' argument is without merit.

We also disagree with defendants' contention the court erred by finding Senior had not lacked testamentary capacity to execute the 2016 codicil. Here, the court relied on the testimony of several witnesses, including DeMartino, who testified that he had spoken to Senior in the Spring of 2016, Senior had contacted him ten times in the hospital to ensure the Madison Property was conveyed back to plaintiff, and, importantly that he had had a conversation with Junior outside the hospital room "wherein Junior expressed his frustration with his father's wish to reconvey the Madison property to [plaintiff]." The court found DeMartino's testimony credible. We defer to the court's credibility determinations as to witnesses, and defendants have presented no basis for us to conclude otherwise. Gnall, 222 N.J. at 428.

Because the credible testimony of McHugh, McKay, Goldstein, and DeMartino establish Senior was mentally capable of executing a legal document in 2016, we see no reason to disturb the court's findings. Those witnesses all testified that Senior either sounded or appeared mentally capable around December 2015 and during the early months of 2016. Indeed, DeMartino testified he would not have prepared the Caregiver Agreement for Senior if he

did not believe Senior was competent to sign it and Senior, in fact, signed that agreement in March 2016, just two months after he had signed the 2016 codicil. Further, the court noted defendants did not present any expert testimony regarding any medical diagnoses Senior may or may not have had.

Even more persuasive, the court found defendants' claim Senior lacked testamentary capacity to execute the 2016 codicil was "belied by the record." Despite Junior's and Cherray's testimony to the contrary, progress notes from MHC dated April 1, 2016, state that Senior had passed a mental competency exam and was "competent and able to make his own decisions regarding his medical, financial and all other decisions." Although Senior had been removed as trustee of plaintiff's supplemental needs trust, both McHugh and plaintiff testified the basis of that removal was Senior's physical health, not his mental health. In fact, Junior conceded that Senior's hospital stays during the last year of his life were all due to physical, not mental, issues.

Based on this record, we reject defendant's arguments and conclude the court's findings of fact and its determination regarding the validity of the 2016 codicil and Senior's testamentary capacity are supported by the competent, credible evidence in the record. Balducci, 240 N.J. at 595. Accordingly, we

find no error in the court's judgment and direction that the January 14, 2016 codicil be admitted to probate.

We next address defendants' arguments as to undue influence. As noted, "[i]n any attack upon the validity of a will, it is generally presumed that 'the testator was of sound mind and competent when . . . execut[ing] the will.'" Haynes, 87 N.J. at 175-76 (quoting Gellert, 5 N.J. at 71). A will "may be overturned" where it is "tainted by 'undue influence.'" Ibid. "Undue influence, to vitiate a will, must be operative at the time the will is executed." Gellert, 5 N.J. at 76.

In a challenge to the validity of a will, "undue influence" is defined as a "mental, moral or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets . . . ." In re Est. of Stockdale, 196 N.J. 275, 302-03 (2008); see also Haynes, 87 N.J. at 176. Undue influence "denotes conduct that causes the testator to accept the 'domination and influence of another' rather than follow his or her own wishes." Id. at 303 (quoting In Re Neuman, 133 N.J. Eq. 532, 534 (E. & A. 1943)).

The analysis of an undue-influence claim is governed by well-established principles. The party challenging the will bears the burden of proving undue

influence.  In re Est. of Folcher, 224 N.J. 496, 512 (2016).  However, where "the will benefits one who stood in a confidential relationship to the [testator] and there are additional circumstances of a 'suspicious character present which require explanation,'" Rittenhouse's Will, 19 N.J. 376, 378-79 (1955), a presumption of undue influence arises, and the burden of proof shifts to the proponent of the will "to overcome the presumption," Stockdale, 196 N.J. at 303, ordinarily by a preponderance of the evidence.  See Haynes, 87 N.J. at 177-78 (explaining the preponderance of the evidence standard generally applies to undue-influence claims arising from challenges to a will).[5]

Applying the requisite standard, we are satisfied the court thoroughly reviewed the evidence and legal arguments in finding in plaintiff's favor and properly rejected defendants' assertions of undue influence and suspicious circumstances surrounding the execution of the 2016 codicil, finding defendants had failed to make a prima facie showing of undue influence.  As previously stated, the court found the credible testimony of plaintiff and McHugh

---

[5]  In Haynes, the Court otherwise noted the preponderance of the evidence standard does not apply, and instead, a "heavier burden of proof" applies to rebut a presumption of undue influence where "the presumption of undue influence is so heavily weighted with policy that the courts have demanded a sterner measure of proof than that usually obtaining upon civil issues." 87 N.J. at 178 (quoting In re Week's Est., 29 N.J. Super. 533, 539 (App. Div. 1954)).

established that Senior willingly signed the codicil, and the testimony of several other witnesses proved it was Senior's intent for the Madison Property to be reconveyed to plaintiff. It was of no moment that McHugh, plaintiff's attorney, had prepared the codicil and that plaintiff stood to gain from the codicil's admission to probate. The competent, credible evidence in the record does not support defendants' contention that plaintiff and Senior were in a confidential relationship and that suspicious circumstances existed surrounding the execution of the 2016 codicil. As the court noted, plaintiff and Senior did not live together, and in fact, it was Junior who lived with his father. Senior did not rely on plaintiff for any of his day-to-day needs. Rather, it was Junior who, along with Cherray, had been living with Senior and had been helping Senior with his day-to-day needs. Junior also had power of attorney, an advance care directive and a Caregiver Agreement regarding Senior.

McHugh testified that in his interactions with plaintiff and Senior, he had never represented himself to be Senior's attorney and in fact, Senior had his own attorney prepare his estate-planning documents. McHugh also testified that the 2016 codicil did not represent a drastic change to Senior's will. Indeed, the 2016 codicil is quite similar to the 2005 codicil and focuses only on the Madison Property. Defendants' arguments are unsupported by the record and the court's

29

determinations regarding undue influence are supported by credible testimony and documentary evidence.

Defendants next argue that any enforceable agreement between plaintiff and Senior regarding the disposition of the Madison Property did not satisfy the requirements of N.J.S.A. 3B:1-4, which governs contractual arrangements relating to death:

> A contract to make a will or devise, or not to revoke a will or devise, or to die intestate . . . can be established only by (1) provisions of a will stating material provisions of the contract; (2) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract. The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.
>
> [N.J.S.A. 3B:1-4.]

We conclude the court correctly ordered the copy of the 2016 codicil be admitted to probate, and the codicil speaks for itself. The codicil stated it was the "only [c]odicil to [Senior's] Last Will and Testament dated February 6, 2003." It revoked Senior's codicil "dated February 9, 2006," and replaced it with the following:

> My sister, [plaintiff], conveyed her property in Madison, New Jersey to me during her lifetime, subject to a life estate retained by her. If I shall predecease her or upon my demise, I distribute ownership of that

property, per capita and not per stirpes, to the living residuary beneficiaries in the Last Will and Testament of [plaintiff], namely, JOSEPH LO SAPIO, GABRIEL LO SAPIO, JR., NANCY SIBONA, VINCENT SIBONA, JR. and PATRICIA COREY.

Lastly, defendants argue the denial of a new trial will result in a "miscarriage of justice shocking to the conscience of the court." An appellant is entitled to a new trial when the denial of a new trial "would result in a miscarriage of justice shocking to the conscience of the court." Township of Manalapan v. Gentile, 242 N.J. 295, 305 (2020) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)). Our Court has described a "miscarriage of justice" as the "pervading sense of 'wrongness' existing 'in the reviewing mind.'" Baxter v. Fairmount Food Co., 74 N.J. 588, 599 (1977) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). We find no basis to support defendants' argument in this record.

In sum, defendants offer no support for their contention the court erred in its decision given the testimony of most of the witnesses, the court's credibility findings and the lack of evidence provided in support of defendants' arguments, including that defendants offered no expert testimony about Senior's lack of capacity or undue influence, and no witnesses to support their claims Senior did not want to reconvey the Madison Property to plaintiff. Defendants also fail to

address the key underlying fact that plaintiff and her sibling, Senior, had entered into an agreement that included the conveyance of plaintiff's properties to assist plaintiff with her estate planning. Moreover, it is undisputed that Senior had previously acquiesced to plaintiff's request that he reconvey to her the Dover Property when plaintiff needed money in 2007, a fact that is indicative of Senior's understanding that although plaintiff had conveyed these properties to him, it was their agreement that Senior would reconvey the properties — both the Dover and Madison properties — to plaintiff at any time she requested that he do so. Johnson, 42 N.J. at 162. We, therefore, disagree with defendants' contention the court erred by denying their motion for a new trial and affirm the court's order providing for the admission of the 2016 codicil to probate.

To the extent we have not expressly addressed any of defendants' arguments, it is because we have found they are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3022-21